## PERKINS et al. v. HASKELL. *
## HASKELL v. PERKINS et al.

Circuit Court of Appeals, Third Circuit.
February 21, 1929.

Nos. 3900, 3901.

*Certiorari denied 49 S. Ct. 513, 73 L. Ed. —.

54

McCarter & English and Arthur. F. Egner, all of Newark, N. J. (A. Owsley Stanley, of Washington, D. C., Homer Cummings, of Stamford, Conn., Sherman L. Whipple and Edward C. Park, both of Boston, Mass., and William A. Kelly, of Stamford, Conn., of counsel), for plaintiff.

Pitney, Hardin & Skinner, of Newark, N. J., and Forrest Hyde, of New York City (Charles E. Hughes, George W. Schurman, Charles E. Hughes, Jr., John Fletcher Caskey, Philip M. Payne, and Harold L. Smith, all of New York City, of counsel), for defendants.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. The defendants have appealed from a judgment entered against them for $8,000,000 in a suit at law which the plaintiff brought under the Federal Anti-Trust Act (15 USCA § 15) to recover treble damages for injury in his business or property which, he alleges, he had sustained by reason of a contract, combination, or conspiracy, of a character denounced by the statute (15 USCA § 1), entered into by the defendants' decedent, James B. Duke, with the Aluminum Company of America. The plaintiff has appealed from an order of the court refusing to treble such verdict to $24,000,000.

The plaintiff's "business or property" in which he claims to have thus been injured consisted of an agreement or contract which, he avers, he made with the same James B. Duke jointly to establish a certain business, and which he alleges Duke breached in the manner and with the intent and effect presently to be stated. Although the suit was brought under the section of the Anti-Trust Law which provides recovery for an injury so sustained, it is manifest that in this instance the basis of the action is the existence of such a contract or property, and, until such a contract shall have been found, all other phases of the statutory action, sounding in tort, must be laid aside. We shall therefore approach this case as though it were on contract, and first determine whether there is evidence of a contract between the parties sufficient to submit to a jury and sustain an affirmative finding.

The essence of the contract pleaded in the plaintiff's complaint is as follows: "Thereupon as a result of the negotiations, an agreement was reached between plaintiff and said James B. Duke, that they should jointly undertake the establishment of an aluminum manufacturing business on said Saguenay river; said James B. Duke to furnish said enterprise the water power at $12 per horse power per annum, and to assist in financing the enterprise; the plaintiff, on the other hand, to contribute to the joint enterprise his knowledge of the aluminum business, its processes of manufacture, the location and

availability of bauxite beds, and other facts which have resulted from the plaintiff's study covering a period of several years."

▮ At the close of plaintiff's case, the defendants moved for a nonsuit on the ground that the evidence of an alleged contract did not justify submission of the case to the jury. At the close of defendant's case a motion was again made, praying binding instructions in their favor. This was refused, and is now assigned for error. We are therefore initially confronted with the question whether the proofs on the part of the plaintiff of the making of a contract by Duke and Haskell warranted the court in submitting the case to the jury. We say the proofs on the part of the plaintiff, for, no matter what the proofs of the defendant were, the test of the present question is the proof furnished by the plaintiff, since we must assume the plaintiff's proofs were true.

Now, the contract sued on, if made, was made at the meeting of Duke and Haskell in New York on July 18, 1924, and, if no contract was then made, subsequent events did not make one. But, before referring to that meeting, we consider the plaintiff's proofs as to the status, situation, and attitude of mind of Duke and Haskell before this July conference, as shown by plaintiff's proofs. Haskell was the president of the Baush Machine Tool Company, which had been for some years engaged, inter alia, in manufacturing products from duralumin, which, as stated by Haskell, is "an alloy of aluminum, containing approximately 93 per cent. of pure aluminum, the balance being copper, manganese, magnesium, and in the case of Baush Machine Tool Company chromium." In 1920 Haskell determined he "must have an independent source of aluminum, a source independent of the Aluminum Company of America, or of the other producers of aluminum, associated with them." He says:

"In arranging for the establishment of such a plant as I had in mind, I wanted cheap water power of abundant quantity and good location, in order to get electricity. * * * To make aluminum one would have to have alumina. There were two ways of getting alumina. One was to buy it, and one was to make it. * * * To make alumina, the essential is bauxite of a suitable quality, from which alumina could·be made. I made investigation to find out about the bauxite situation. I also made investigation to find out the best method of manufacture of alumina. In the investigation I made in order to try to locate a suitable water power,·I applied to the known companies in the United States who had developed large water projects, applied both in person and by letter. * * * I turned to ·Canada. It was not the next step. It was simultaneously. I was conducting my investigation in search of water power principally· in the United States. I preferred to get power in the United States, if I could. I received a letter from the Canadian minister, having water power supply in his control, suggesting that I communicate with, I think, W. S. Lee, the vice president of the Quebec Development Company, relative to a water power in the Saguenay river in Canada."

Steps to finance his proposed company had been taken by Haskell, which steps he testified were as follows:

"Prior to the time that I came in contact with the representatives of the Quebec Development Company, I had taken some steps towards financing my proposed plant. For that purpose I had been in contact with Messrs. Redmond & Co., 33 Pine street, New York City, and Hayden, Stone & Co., 25 Broad street, New York City, both banking concerns. As to Redmond & Co., I had negotiated principally with Perry Osborn. He is a well-known banker in New York. As to Hayden, Stone & Co. I was in contact with Richard F. Hoyt. * * * Three to four years elapsed between the time when I first seriously planned this water power, this aluminum project and the time when I first came in contact with the representatives of the Quebec Development Company. I came in contact with them in 1924. I had been working at this project three or four years. I had been abroad with regard to it; more than once; several times. It is fair to say that I had made a study of this subject for a period of a year. Putting my own time into it. And my own money. And paying all my own expenses. These expenses were not paid by my company. They were all personal to myself."

Following up the suggestion made by the Canadian government, Haskell on March 8, 1924, wrote to the vice president of the Quebec Development Company: "I understand that you are developing the Saguenay river in Quebec, Canada, and that you desire to dispose of power. I am in the market for about 50,000 horse power." To this Lee replied on March 10:

"I am in receipt of your favor of March 8th, and wish to thank you very much for same. We are building a very large power development on the Saguenay river and shall be very pleased to serve you with power. I have been in the hospital for the past ten

days on account of tonsil operation, but am hoping to be in New York during next week. I would like very much to meet you and have a personal conference in order to discuss this matter with you. I would like to know something more about your requirements as I feel quite sure that we would be able to serve you after determining same. In the meantime if you are in New York City, I would be very pleased if you would drop in to see Mr. George G. Allen in our New York office. You will find Mr. Allen at No. 511 Fifth Avenue, fourteenth floor. Again thanking you for your inquiry, I am."

In pursuance of Lee's suggestion that he meet Allen, Haskell did so, and what transpired is evidenced by Plaintiff's Exhibit P 13, record, page 1400, which is Allen's account of the meeting, in his letter to Lee:

"I have had a long conference with Mr. Haskell this morning relative to the Saguenay power for aluminum purposes. Hr. Haskell tells me that his plans are developing more rapidly than he thought when he had his first interview with us here. Subject to making some tentative arrangement with us he is preparing to go abroad within the next couple of weeks and believes that he will be able to consummate his plans.

"The proposition he wishes from us is an option good for four months to make a contract to take 50,000 horse power from us at the station at $12 per horse power, with a further provision that we would be willing to accept from his company, to be formed, its three-year notes for the first six months of power furnished, such notes to be a first charge on his company and subject, of course, to our satisfying ourselves as to the investment which he will make in that company and which will stand behind these notes. Such investment, he feels now, will represent between $1,000,000 and $2,000,000. The reason he is asking this last concession is because his company will, during that period, be going through what we might term an 'incubating stage.'

"Subject to your ability to furnish this amount of power at the time specified, in addition to other commitments made and possible commitments which we have in mind, I recommend that we give Mr. Haskell the option which he is asking and on the terms which he suggests. I have told Mr. Haskell that you would discuss this matter fully with Mr. Duke and put us in position to give him a definite answer some time next week. No doubt Mr. Duke and you will feel that we should submit the proposition to Sir William Price's office before making any definite commit-

ment. In the event that this is agreed to won't you kindly furnish me with the form of option which should be given to Mr. Haskell?"

Following this, on April 15, 1924, Duke, as president of the Quebec Development Company, gave Haskell, who was sailing for Europe that month, a power option for Haskell's proposed aluminum company as follows:

"Referring to your conference with Messrs. George G. Allen, W. S. Lee, and the writer, and your further conference with Mr. Allen regarding the purchase of fifty thousand horse power of electric power from the Quebec Development Company, Limited, at or near Isle Maligne, Canada, by a company which you propose hereafter to organize, while the conditions under which this power would be delivered, and the terms of the proposed contract for its purchase have not been settled upon with sufficient definiteness to enable the Quebec Development Company at this time to give you a definite and valid option for the benefit of your proposed company, yet the Quebec Company will, for the period of four months, reserve this amount of power so that it will be available for the use of your proposed company if upon its organization it desires to contract therefor, and from our conference I feel sure that such a contract can be agreed upon. The Quebec Company would consent that the term of the contract be for a long period, say twenty years, with the privilege of renewal by your company for an additional term of twenty years upon five years' notice prior to the expiration of the original term. The power would be delivered at the Isle Maligne station of the Quebec Company, from the bus bars of the generator, at approximately 13,-200 volts, and be three-phase, alternating, at approximately 60 cycles per second periodicity. Your company shall agree to pay for the power delivered to it monthly at the rate of $12 per horse power per annum, and also pay any additional taxes which might be levied or assessed against the Quebec Company over and above those now in effect, which would result in decreasing the net return to the Quebec Company on account of the sale of said power.

"The Quebec Company now has its plant well along towards completion and unless prevented by causes beyond its control, will be ready to commence delivery of power to your proposed company within one year. For the power delivered during the first six months the Quebec Company will be willing to accept the three year notes of your pro-

posed company, bearing interest at the rate of 6 per cent. per annum from their date. The board of directors of the Quebec Development Company would, of course, have to be satisfied of the ability of your proposed company to duly perform its part of the contract, including its ability to pay the notes referred to upon their maturity. The contract would contain such provisions as might reasonably be required to insure the due performance by each party of its obligations under the contract.

"If this letter is not sufficient for your purposes, we can definitely settle upon the terms and conditions under which the power shall be delivered and the character of the company which you propose to have organized, and the Quebec Development Company can then give you a definite binding option. In the meantime, and for the period stated, it will reserve the amount of power named in order that it may be available for sale to your company."

As bearing on Haskell's situation, purposes, and associates at that time, his testimony was: "I told Mr. Allen and his associates there what my purpose was in securing this water power or the option therefor, what kind of a plant I proposed to establish and why I was going to Europe. At this interview I was asked about the name of the company or whom this option was to run to, and I explained fully and frankly that it was a company that I contemplated forming for manufacturing aluminum.. I asked them to keep this confidential, not to talk outside about it; and it was left in that manner. * * * My recollection is that I said something about the size of the company; it was a pretty large commitment of power that would amount to some $600,000 a year payment—a commitment of $600,000 a year for the proposed horse power. My recollection is that we did discuss that but not in so much detail because it was a matter that was being referred to Mr. Duke. They said they were going to refer it. And the letters show that I told Mr. Allen I was going abroad because I wanted to check up on some details of the manufacture of aluminum; I also wanted to talk with some associates of mine, relative to seeing whether they would like to become interested with me in this aluminum company. I told them I was taking with me Mr. Daniels, an engineer; Mr. H. O. Shepard, an engineer; Mr. Harrington, a metallurgist. I have given a fair picture of generally what occurred between me and Allen. There was some further talk there; and I was asked to come back and see them after my return from Europe."

Evidently after the acquiring of the water power option Haskell brought his proposed company to the attention of plaintiff's witness Hoyt, a member of Hayden, Stone & Co., bankers, who testified:

"I did meet Mr. Haskell; he came to my office. That was in the spring of 1924. My office was at 25 Broad street, with Hayden, Stone & Co. Mr. Haskell wished to find out if Hayden, Stone & Co. would be interested in the promotion of an aluminum metal industry. At that meeting he had with him various papers, outlining different phases of this industry that he wished to enter with him. Something was said about water power. The location of the water power was mentioned.

"Q. Where was the water power? A. He stated the water power was owned by the Duke interests."

After his trip abroad, Haskell called the matter to the attention of plaintiff's witness Osborn, of the banking firm of Redmond & Co., who testified as follows: "We informed Mr. Haskell that we were decidedly interested in his plans for the formation of an aluminum company in this country. I recall that Mr. Haskell sent us a memorandum descriptive of the aluminum business, which he had made up after his trip abroad."

From this it will be seen that Haskell's situation and purpose then was to form his own company, with a capital of between $1,000,000 and $2,000,000, and to that end he had studied the aluminum situation, had sought and obtained a provisional power option from the Quebec Development Company; that he was seeking the aid of bankers and other persons to become interested in his company; and that the Quebec Development Company, of which Duke was president, was desirous his project should go on, and was willing to give the option, as stated in Allen's account above quoted, "subject, of course, to our satisfying ourselves as to the investment which he" (Haskell) "will make in that company and which will stand behind these notes." With this general situation in view, Haskell took three experts and went to Europe to prepare a report for his bankers, who, as appears from the testimony, thought favorably of his plan if bauxite could be obtained.

After visiting a number of places in Europe, Haskell and his party returned and made out a report, which was afterwards submitted to the bankers and which was the subject of discussion in a visit made to the Saguenay hereinafter referred to. We note here that the plaintiff's witness Shepard, who testified and who joined in making the re-

port, says of it: "I believed we had enough data to intelligently know the subject. I would not say as broadly as that I was able to go into the manufacture of aluminum.

"Q. Well, would you want to go into the manufacture of aluminum on the combined knowledge of yourself and Mr. Haskell, Mr. Harrington and Mr. Daniels? A. I would feel that further study was necessary."

What was Duke's situation? The plaintiff's proofs show the Quebec Development Company, of which Duke was the majority shareholder, was engaged in the development of water powers on the Saguenay river, and had and were expending vast sums. What was called the upper Saguenay project, which alone for the present we need consider, was under way, but not completed, and which would develop some 350,000 horse power, had already cost $35,000,000. What use was to be made of this power, to say nothing of the 700,000 horse power the lower Saguenay kindred project was expected to produce? Confronted by this question, the proofs show that Duke, through the American Cyanamid Company, had carried out an exhaustive and widespread investigation through that part of Canada to find some basic product that would make possible the use of this great water power. This investigation was made in 1923 and involved the expenses of an exploration expedition which worked for six months under the direction of Professor Berkley, of the Department of Mineralogy of Columbia University, at an expense of some $55,000. It resulted in the discovery of no basic mineral which could use the Saguenay power, so that the necessity of research elsewhere was apparent to Duke and his associates. We here note, as throwing light on subsequent research efforts, that the expenses of this futile search in Canada were paid for by the American Cyanamid Company, and Bell, its president, and Cooper, its vice president, co-operated with Landis therein.

Early in June, 1924, Haskell was invited by Duke to make a trip to Saguenay. Haskell expressed a desire to bring Shepard, his engineer, with him. Among others in the party was Dr. Landis, who was an experienced metallurgist and was employed by the American Cyanamid Company, and who had made the general research just referred to. He was a man of scientific attainment, and was the principal and all-important witness called on behalf of the plaintiff. Landis testified that on the trip up to the Saguenay the subject of aluminum was discussed, and that "Mr. Haskell represented that he could

produce aluminum at a rather low price, and I disputed the fact that his figures were representative of the cost of production in this country. Mr. Duke suggested, 'Well, if you two fellows can't agree, you had better go and reconcile your figures a little bit.' It does appear that Mr. Duke had, prior to that confab that I have just described, talked about aluminum with Mr. Haskell. And in the course of that conversation there was some difference of opinion between me and Mr. Haskell and perhaps Mr. Shepard as to the cost of production. And Mr. Duke was aware of the difference of opinion. And as a result of that situation it was Mr. Duke that suggested then that I sit down with Mr. Haskell and with Mr. Shepard and endeavor to reconcile the difference. I was an officer, at that time, of the Cyanamid Company." Dr. Landis continued:

"There was conversation that I recall with regard to aluminum or the establishment of an aluminum plant or some other discussion on the subject, prior to the time I sat down with Haskell and Shepard and considered figures. Mr. Haskell exhibited on the morning of, I believe it was Tuesday morning—I don't remember the date—we left Sunday night, traveled all Sunday night up to Montreal, spent the day in Montreal, left on the evening train from Montreal, arriving at Isle Maligne on Tuesday morning, very early, and after breakfast Tuesday morning, Mr. Haskell brought out his samples of duralumin, showed them to us and went into the car and in the demonstration and the exhibition of those samples, the subject of aluminum was discussed. I cannot recall what was said word for word, it is 2½ years ago. I have been rather busy on a great many other projects since then, so I cannot give it verbatim. In substance Mr. Haskell brought out a large number of samples of aluminum alloys which he exhibited and said that these alloys contained a very considerable quantity of aluminum and he thought that the prospects of a market for them were sufficient to make a very attractive prospect for the disposition of the products of an aluminum plant; and he mentioned at that time talking to the various groups assembled in the car, that he had been considering for a long time, some years, going into the production of aluminum, had been abroad, that he thought the Saguenay would be a good place. In fact, I think, as I recall, that he mentioned he had an option on some power up there to go into the aluminum manufacture.

"I recall that Mr. Duke asked him if he

thought he could make aluminum. He said he thought he could. He asked him if he could make it cheap enough to be competitive with other producers, and he said he thought he could. Mr. Duke said, 'Well, have you got your necessary raw materials?' He said he thought he could get them all right. And in general the discussion went along about those lines. There was some considerable development of the field of market for these various products there which interested all of us.

"This discussion of the use of the Saguenay water power in connection with Mr. Haskell's plan was discussed, and in that discussion I learned first that Mr. Haskell had an option on some power up there, which was a very surprising fact to me. I am not clear in my remembrance how much was covered by the option; it was forty or fifty thousand horse power, but I am not definitely clear in my remembrance of that. I know from subsequent discussions that it was 50,-000 horse power but from direct remembrance of that conversation, I am not so clear. I do know that the number of horse power was discussed and that he said he had an option, or other words to that effect. And that he was seeking this water power in connection with the manufacture of aluminum. All that was made perfectly clear. And it was over the discussion with regard to the cost of production that this situation arose which led Mr. Duke to suggest that we retire and fight it out amongst ourselves, or words to that effect. That was a very natural answer to come out, because a power man can't afford to tie himself up to a power contract with something that isn't going to prove commercially possible after he has started. I believe Mr. Haskell had some papers up there, some letters regarding aluminum markets, that there was some discussion on, and he had some reports there, and there was some little discussion about those, but I can't remember all the details of them. * * *

"As to whether I have given all the conversations that I recall that occurred prior to the consideration of the Haskell figures, I am not absolutely clear about a conversation taking place before or after the consideration. I know Mr. Haskell talked about some financial assistance that he expected to get from England, I believe it was, some people in New York, in order to make this project possible; but it was a matter that I was not very much interested in, and therefore didn't even try to remember enough to pin the time that it occurred. My recollection goes only to the point that he said something about that, but I couldn't say whether it was before or after the figuring."

Following this his testimony was:

"Q. All right. Now, was there any discussion prior to the time that the figures were considered as to the available supply of bauxite? A. Yes.

"Q. Was there some difference of opinion between you and Mr. Haskell on that point, too? A. Not only between me and Mr. Haskell, but Mr. Duke and Mr. Haskell had some words.

"Q. Now, what was that? A. Mr. Duke asked Mr. Haskell if he thought he could get bauxite for this proposition. I asked Mr. Haskell if he thought he could get sufficient bauxite for a proposition of that sort.

"Q. What did Haskell say? A. He said he thought he could.

"Q. What did you and Duke say, or either one of you? A. I don't recall exactly what Mr. Duke said, but I, myself, said that I doubted very much whether there was enough available bauxite of the right quality for such a development as Mr. Haskell proposed at a price you could afford to pay for it.

"Q. Of course there is a supply of bauxite in the United States? A. There is bauxite found in the United States.

"Q. And why wasn't that available? A. Well, some of it is not suitable for the manufacture of aluminum; some of it is too high-priced to enter into competition with some of the low-cost producers of aluminum and some of it is owned by present producing companies."

That evening the figures were discussed, and Landis' account of it is substantially covered by his statement:

"What was the net difference when you got through figuring, what was Haskell's figure and what was yours? A. I never had any figure, all I did was try to correct Haskell's figures, so far as they went. * * *

"Q. That is, 14 cents was his estimate, and you thought that at least 2 cents too low? A. My remembrance is that I brought that up to 17 cents or over.

"Q. Do you recall that? A. Yes; that is true."

Whatever was the result of the discussion, Dr. Landis testified that the report made to Duke was:

"It is my remembrance that the next time the subject was brought up was some time after breakfast the next morning, I think that was Wednesday morning, as far as the day of the week goes; but the date I don't recall. It was the following morning. If

was the same day, really; we broke up at 2 a. m., and it was the same day. The matter was discussed in the presence of Mr. Duke after breakfast. I think some of us were sitting in the observation end of the car smoking after breakfast, and Mr. Duke, who came in to breakfast later than Mr. Lee and some of the early risers, came in later while we were sitting there, and said, 'Well, how did you fellows come out last night?' or words to that effect; and I said, 'Well, I think I showed them some error in their figures, that they ought to have been—such figures as they had ought to have been brought up at least a couple of cents.' I also at that time expressed the opinion that the subject ought to be more thoroughly gone into and studied. Something was said at the following interview as to the necessity or desirability of finding bauxite. I don't remember just who of the party said it, but the question came up —following our discussion of the figures and then going on to the necessities of the industry in the shape of raw materials; and I just can't say which one of the group sitting in the car there at the time offered the suggestion, but they thought it would be a good thing to look up and see whether any bauxite could be found, and such other materials as were needed for the manufacture of aluminum. That is about all that I remember. That was Wednesday; I think we left there a Thursday night. Anyway, we got back to New York, either the following Saturday or Sunday. I think it was Saturday night when we came down; I am not certain of that. Before the rest of us went back Mr. Haskell and Mr. Shepard left the party, and there had, prior to their departure, been this discussion of the necessity of finding bauxite."

The significance of these figures is that on a 10,000-ton yearly output, a 2-cent cost difference would be about $45,000; on a 3-cent difference, $67,500; and on a 20,000 yearly output double those figures.

We therefore have the testimony produced by the plaintiff that on this visit Duke was apprised by the expert metallurgist of the American Cyanamid Company, Landis, that he doubted whether sufficient quantity of bauxite of the right quality for such a development as Haskell proposed could be had at a price you could afford to pay; and, second, that Haskell's cost figures in his judgment were too low by 2 or 3 cents a pound. It is therefore clear by the testimony produced by the plaintiff the situation was one of which the witness Shepard, who was Haskell's expert, testified, "I would feel that fur-

ther study was necessary;" and of which Landis testified as above, "I just can't say which one of the group sitting in the car there at the time offered the suggestion, but they thought it would be a good thing to look up and see whether any bauxite could be found, and such other materials as were needed for the manufacture of aluminum."

As pertinent to the visit to the Saguenay, the plaintiff produced two witnesses who testified to statements made by Duke which show his then uncertainty as to the possibility of obtaining a sufficient quantity of bauxite to warrant going into the making of aluminum. Shepard, Haskell's engineer, testified:

"Mr. Duke seemed to have the obsession that it was impossible to procure bauxite, and that subject was brought up for the second or third time, and, if our figures were all right, maybe they were, but could bauxite be produced for making aluminum? Dr. Landis seemed to feel very much the same way as Mr. Duke felt, that the big question was in being able to procure bauxite. Mr. Haskell did not feel that way at all, and stated that he could find the bauxite. Mr. Duke seemed to feel a little relieved at that, but he stated that, if bauxite could be procured in large enough quantities, he would be willing to invest in the proposition in a large way. Mr. Haskell informed him that he felt very sure that he could procure the bauxite, to which, in substance, Mr. Duke said, 'Go and find it.' Mr. Haskell said that he could do it, and Mr. Duke stated that if he would find it—if he could find it—that he would have Dr. Landis investigate the proposition also, to check up on Mr. Haskell's findings. Mr. Duke said, if bauxite could be found in large enough quantities so that aluminum could be produced at a cost to compete with the Aluminum Company of America, that he would be glad to enter the project and invest money on a large scale. * * *

"Mr. Duke spoke about the fact that there would be competition for any newly started aluminum plant, and, in substance, that it would be unwise to start such an industry unless reasonably well-equipped to compete, and that he regarded it as essential to any possible successful competition, that there should be a large supply of bauxite. In substance, he said, bauxite of the proper quality and amounts. * * * Mr. Duke said something about the size of the supply of bauxite that he would think should be obtained; enough for 20 years' operation, something of that nature, substantially."

The testimony of Dr. Landis, the other

witness called, which showed Duke's uncertainty as to the bauxite supply was:

"Something was said at the following interview as to the necessity or desirability of finding bauxite. I don't remember just who of the party said it, but the question came up —following our discussion of the figures and then going on to the necessities of the industry in the shape of raw materials; and I just can't say which one of the group sitting in the car there at the time offered the suggestion, but they thought it would be a good thing to look up and see whether any bauxite could be found, and such other materials as were needed for the manufacture of aluminum. * .* * Before the rest of us went back Mr. Haskell and Mr. Shepard left the party, and there had, prior to their departure, been this discussion of the necessity of finding bauxite."

In fact, both witnesses agreed that the data and information then available was not complete. In that regard Shepard's testimony was:

"Q. And when you got all through did you feel that you had the data on which you or anyone else might engage successfully in the manufacture of aluminum? A. I believed that we had enough data to intelligently know the subject; I would not say as broadly as that I was able to go into the manufacture of aluminum.

"Q. Well, would you want to go into the manufacture of aluminum on the combined knowledge of yourself and Mr. Haskell, Mr. Harrington, and Mr. Daniels? A. I would feel that further study was necessary."

And of Doctor Landis:

"I also at the same time expressed the opinion that the subject ought to be more thoroughly gone into and studied."

It will thus be seen that at the date of this interview, Duke is shown to have several things in view: First, that a supply of bauxite sufficient in quantity and suitable in quality was necessary; second, that his own expert did not believe it could be obtained; third, that Shepard felt necessary, and Dr. Landis advised, further research and inquiry should be made. We find that the proofs adduced by the plaintiff show affirmatively, and without contradiction, that at the close of this visit Haskell and Duke not only did not agree to enter the aluminum business; that they had not the knowledge that would enable them to do so, but one of their own technical advisers felt, and the expert of Haskell advised, against it. The testimony of Shepard, quoted above, also shows at the close of the conference the thought was for Haskell to make the search for bauxite and Duke would have Landis check up Haskell's search. In that respect Landis, as quoted above, testified: "Mr. Haskell informed him that he felt very sure that he could procure the bauxite, to which, in substance Mr. Duke said, 'Go and find it.' Mr. Haskell said that he could do it, and Mr. Duke stated that if he would find it—if he could find it—that he would have Dr. Landis investigate the proposition also, to check up on Mr. Haskell's findings."

We stop at this point to say the proofs further show that Duke was impressed with the possibilities of going into the aluminum business as a means of marketing his power, and therefore requested the further conference with Haskell, which was held in New York on July 18, 1924. There is no proof— and in the nature of things there could be none—that in the few days that intervened before the meeting of July 18th that any investigation was made or anything occurred to clear up the uncertainty in Duke's mind. Haskell had been told to make the search and find the bauxite supply, and that Duke would then have Landis check up Haskell's search; and it was in this situation, viz. a research to be made by Haskell and a check on it by Landis, Duke and Haskell met on July 18th. It is now contended that a contract was then and there made, by which both men obligated themselves to enter an aluminum business which it is now alleged would have netted Haskell $8,000,000 as his share of the profits of such contract, and by which Duke then and there contracted to furnish many more millions to earn this profit. Was such a contract made? Did the two men contract? We use the term "contract" advisedly, and discard the euphemistic term of "adventure," "joint adventure," which beclouds the true question of contract consideration, contract mutuality, which obligated Duke to do defined things on his · part and Haskell to do defined things on his part. Moreover, we are not dealing with inferences, presumptions and implications. They have no place. Haskell and Duke were together face to face.

They spoke, and what they said the plaintiff shows by his witness Landis. It will thus be seen that the existence of the alleged contract then and there made, if made, must be shown by Landis' testimony of what the two men then and there contracted to do. So regarding the basic necessity of proof of a contract, we turn to the testimony of Landis as to what was said by the two men. We quote his testimony bearing on that question:

"There was, in fact, a conference on July

18th, in Mr. Allen's office, 511 Fifth avenue; Mr. Allen, Mr. Perkins, Mr. Duke, Mr. Haskell, myself were present.

"Q. May I inquire of you, Dr. Landis, whether at that interview you received authority to pursue the subject? A. I didn't receive any authority; I received some funds and instructions to investigate the production of aluminum.

"Q. Do you remember in the deposition I have heretofore referred to, this question was asked you and this answer given: 'Q. At that conference did you get authority to pursue the subject? A. Yes, I got authority to study the matter of raw materials for aluminum production.' Correct? A. I presume that is correct; yes.

"Q. Well, you haven't any doubt about it, have you? A. No; you have a better record than my memory.

"Q. Yes, I am reading from the stenographic record taken at the time; that is why I have so much confidence in it. Now, from whom did the authority come and under what circumstances? A. Mr. Duke.

"Q. And were the necessary funds guaranteed or were funds guaranteed? A. Yes, the Quebec Development Company through its president, Mr. Duke, guaranteed $50,000 for this investigation. Mr. Duke made that arrangement and I did proceed under that authority to investigate. That investigation lasted practically a year.

"Q. Instead of spending $50,000, it ultimately cost $180,000? A. Not necessarily that investigation. There were other investigations included in that charge for $180,-000.

"Q. But the bulk of it was in connection with this inquiry, was it not? A. I cannot tell you the distribution of the sum.

"Q. Well, hereafter we will produce the very bill itself. There was a bill put in for it, wasn't there? A. Yes, sir. I know, as a matter of fact, that the Cyanamid Company paid the bill and was reimbursed by the Quebec Development Company. It was at this conference that Duke authorized the investigation to go on, told me to go ahead with it and arranged to place at my disposal $50,000, this fund was originally paid out of the Cyanamid Company and reimbursed to the Cyanamid Company by the Quebec Development Company. And the expenses finally incurred in this investigation ran far in excess of $50,000 and are embodied in a bill, detailed bill made out, which bill was made good to the Cyanamid Company by the Quebec Development Company.

"Q. We will come to the bill itself a little later; do you remember what occurred at that conference between yourself, Mr. Duke, Mr. Allen, and Mr. Haskell, any conversation that took place? A. Yes, some things, the general language. I cannot give you the verbatim statements of the various individuals; the substance of the conversation is this: that Mr. Haskell thought that it was time that this subject which he had been interested in in establishing the aluminum plant on the Saguenay and using power from the development, and the various problems connected therewith, should be put upon a more sound basis and some sort of a more formal organization of the various parties who were interested or might be interested should be set up to go ahead with this investigation. I don't recall the exact words, but it was something to the effect that Mr. Haskell said the bankers were interested now, we ought to keep up their interest. I mentioned the fact that it was a pretty expensive investigation to conduct to set up a project of this nature; there would have to be some money. Mr. Duke said the Quebec Development Company would take care of funds, 'How much did I want.' I had made no estimate, when I went into the conference at all. I just off-hand said $50,-000, knowing that that was as good a guess as any at the time; and he said, 'Well, the Quebec Development Company will guarantee up to $50,000. Now, you go out and see if you can find these raw materials, see if you can show me how to make this aluminum as cheap as anybody else and just as good or better.'

"Q. Well, what was Mr. Haskell to do in the matter do you remember? A. Yes, he turned to Mr. Haskell and he said, 'I suppose you will co-operate with Dr. Landis in this matter?'—some words to that effect; I don't—

"Q. What did Mr. Haskell say? A. He said he would.

"Q. I will inquire of you whether he did co-operate with you. A. Yes; I think he furnished us all the information that he probably had.

"Q. Do you recall any further conversation? A. No.

"Q. If so, let us have it; I would like to get it all. A. I am not very clear on the exact words of it, because my particular interest in this matter was only as an engineer; I was not associated with either party or employed by either party. So I paid more attention to the features which properly fall to the engineer. I had certain instructions from my own company, that

when I was talking aluminum or any other project for the Saguenay, not necessarily aluminum alone, but any project, that I was to look out for their interests.

"Q. Well, I am not asking you, Doctor, for an explanation of why you don't remember. I am only asking you to tell me what you do remember. A. There was some conversation about setting up a company, and I can't give you very much detail of it, because the only thing that stuck out was Mr. Duke said, 'Well, that is something for Mr. Perkins to take care of.' It wasn't my problem.

"Q. That is, the details in connection with the organization of the company would be left to Mr. Perkins, the lawyer, Mr. Duke's lawyer? A. Yes. And I remember something to the effect that he turned to me or turned towards me and he said, 'You have got to show us how to make this material cheaper than the other fellow, before I will let any of my companies put any money into it'; and that is about all that I recall. The conference lasted about an hour or probably a little less than that.

"Q. And in regard to the expense which it would entail to make this investigation upon which you embarked, do you recall whether a question arose as to whether or not Mr. Haskell should pay any of those expenses, and what Mr. Haskell said, and what Mr. Duke said? A. I have a hazy recollection that that subject was discussed.

"Q. Suppose I try and refresh your recollection, Doctor? Wasn't this what was said in substance? That Mr. Allen suggested that Mr. Haskell should pay part of the expenses of this investigation, and Mr. Haskell then said, in substance, that he had already spent many thousands of dollars in this matter, that he felt that he ought not to be called upon in his then personal financial situation to do any more, and Duke said that was right, or words to that effect? A. I think that was about the general tenor of the conversation. * * * Following that interview I did embark upon the task of conducting the investigation that had been discussed. I went right out and tried to employ the best men that same day I could get hold of. All this had to do with the location and rounding up of raw materials, in connection with the proposed aluminum plant on the Saguenay. I had charge of the setting up of an organization to make this investigation. I was the head of that particular organization then. Our office was at 511 Fifth avenue."

Having then before it this testimony as to what the two men said when face to face when and where a contract was or was not made personally by Duke and Haskell, the trial court was confronted with the preliminary question, did it show a contract? Was there a meeting of minds? Did it show that Duke promised and agreed to do some defined, specified, particular thing or things on his part, and that Haskell agreed to do some defined, specified, particular things on his part, and was that a contract by each and both to enter the aluminum business? That Haskell demurred to pay for any further investigation, and that the investigation which Duke at the Saguenay conference had told Haskell to go ahead and make, was given up and Duke than undertook to make it himself; that Duke agreed to have his company finance it, that he assumed Haskell would co-operate in the investigation and Haskell said he would, is shown by their talk; but beyond purposed investigation by Duke at his company's expense, we find nothing that Haskell said to obligate himself to go into the making of aluminum or to furnish any funds to finance such business, or nothing Duke said to obligate himself. If Haskell had refused to perform the alleged contract and Duke had filed a bill against him for specific performance thereof, what contract could a chancellor spell out? If Duke had refused and Haskell sought specific performance, what would Duke have been decreed to do? What particular thing could have been decreed for either Haskell or Duke to do? Was there to be a partnership? If so, who was to furnish the capital? Was Haskell to furnish any? If so, how much? Was a corporation to do it? If so, how was it to be financed? What shares were to be owned by either? What was the capacity of the plant? When was all this to be done? Was Duke to be reimbursed for the $50,000 research money which he promised and if it did not enable the research to be made, who was to furnish the balance? Indeed, the only definite, concise thing the situation developed was that Duke volunteered to make and pay for a research, and Haskell agreed to co-operate with him in doing so; and beyond that the future was not provided for by a contract then fixed and entered upon. That Duke seriously contemplated going into the aluminum business, that he was so much impressed by it that he was willing to spend $50,000 to investigate, can be found in their talk as testified to by Dr. Landis; but that Duke and Haskell then and there bound themselves by contract to go into the aluminum business in a way that would bind

them to do so after Duke's investigation, and that would bind Duke's estate in case of his death, is not shown by any statement Duke or Haskell then made.

■ Nowhere is a contract better described and its requisites laid down than by the master mind of legal definition, Sir William Blackstone, viz.: "An agreement upon sufficient consideration, to do or not to do a particular thing." From which definition there arise three points to be contemplated in all contracts: (1) The agreement; (2) the consideration; (3) the thing to be done or omitted, or the different species of contracts.

Now, it will be observed this suit is one between Haskell and Duke to recover damages for the breach of a contract made by Duke, with gravamen of the plaintiff's complaint, and his statement of the particular thing Duke agreed to do and did not do was, as we have seen, in the statement of claim that Duke was "to assist in financing the enterprise." To what extent, how much in money, in service, in stock, loan, indorsement, neither the statement avers or testimony proves. The proof as to proposed financial assistance by Duke is by Shepard, who, speaking of the conference at the Saguenay in June, says in language already quoted: "Mr. Duke said, if bauxite could be found in large enough quantities so that aluminum could be produced at a cost to compete with the Aluminum Company of America, that he would be glad to enter the project on a large scale." Landis, referring to the July meeting, when the contract sued on is alleged to have been made, and after Duke had directed the making of an investigation by Landis and providing funds for it, said: "He [Duke] turned to me, or turned toward me, and he said: 'You have got to show me how to make this material cheaper than the other fellow, before I will let any of my companies put any money into it.'" And Mayo, who talked to Duke in January following, when "he [Duke] told me he had made arrangements with Hr. Haskell to go into the aluminum business, and develop sufficient water power for it; that he had men out hunting bauxite and other necessary doings to lead up to." But this testimony fails to show any contract by Duke to embark in such a large enterprise, but a willingness on his part to adventure his own funds in the adventure of an exploration for information. That such exploration was his own was shown by the facts it was made by the scientific engineer of the Cyanamid Company, one of his own companies, that Haskell declined to bear any part of the expenses thereof, that it was treated on the books and in the financing as a continuation of the preceding general research for basic materials made in Canada, and that the officers of that company took part in the later research just as they had in the former, and that the cost of such research was, without conference with Haskell, substantially trebled.

■ In view of these proofs produced by the plaintiff, the trial judge was in error in not taking the case from the jury; for, if the court from the testimony thus produced by plaintiff was not able to say a contract was then made, he should not have submitted the case to the jury to make one. And this is particularly true when the testimony from which the court allowed the jury to find a contract different from the undertaking of an investigation the plaintiff had first proved by Landis is considered. This testimony consists of conversations and correspondence between the plaintiff and the several persons employed to make the investigation of bauxite reserves and manufacturing costs, together with their acts and doings in furtherance of the investigation, offered, admitted, submitted, and regarded by the jury as evidence of a completed contract between the plaintiff and Duke having different terms and an altogether different object and legal effect from those of the original undertaking of investigation already proved.

What the plaintiff said and wrote, not to Duke, but to the persons engaged in making the investigation, and, indeed, in several instances what he said to strangers, were inadmissible under the familiar rule against self-serving declarations. What the several investigators said and wrote to the plaintiff and to one another, and what they did in the progress of their employment, admitted in evidence to prove the character and terms of an alleged contract between Haskell and Duke, was not valid evidence of such contract, and did not bind Duke, in the absence of evidence showing they were speaking and acting as his agents in respect to the making of a contract. Witnesses not present when it is alleged a contract was made on July 18 manifestly cannot be heard to say what contract, if any, was then made in their absence; nor can their later words and acts, unless shown to have been authorized by Duke, vary the terms of the undertaking then reached, and develop it into a full-grown contract embodying terms not then broached. It was, we think, mainly by this evidence, inadmissible in the first instance and, when submitted, given a value it

did not possess, that the jury was moved to its verdict.

As these errors alone are dispositive of the case here on appeal, the many questions which would arise on a contrary finding of evidence sustaining a contract of the character claimed call for no consideration. We are constrained to dismiss the plaintiff's appeal, and on the defendants' appeal reverse the judgment and remand the case to the District Court, there to be disposed of in conformity with the law.