## L. P. LARSON, JR., CO. v. WILLIAM WRIGLEY, JR., CO.

## WILLIAM WRIGLEY, JR., CO. v. L. P. LARSON, JR., CO.

(Circuit Court of Appeals, Seventh Circuit. April 2, 1927.)

Rehearing Denied August 30, 1927.

Nos. 3727, 3728.

1. **Appeal and error ⟨⟩1099(3)—Prior decrees on appeal, for accounting of unfair competition profits, without limiting territory, fix law of case.**

Prior decrees of appellate courts in suit for unfair competition, that complainant is entitled to accounting of profits without limitation to competitive territory, established law of case.

2. **Trade-marks and trade-names and unfair competition ⟨⟩98—Defendant, using unfair and oppressive means to eliminate competitor, cannot restrict accounting for profits of package dress infringement to competitive territory.**

Accounting of profits for infringing competitor's package dress will not be restricted to competitive territory, where infringer employed unfair and oppressive tactics to eliminatae his competitor from market.

3. **Trade-marks and trade-names and unfair competition ⟨⟩98—Injured party, seeking profits of infringer, takes chance of their reduction or extinguishment through expenses and losses incurred in good faith.**

Where injured party seeks profits of infringer, he takes chance of their reduction, or even extinguishment, through expenses and losses actually incurred, however unwisely or even improvidently, so long as they were incurred in good faith.

4. **Trade-marks and trade-names and unfair competition ⟨⟩98—Expenses of advertising held deductible on accounting for profits of package dress infringement.**

Expense for advertising, contracted and paid for in good faith, *held* an expense which should be deducted in fixing net profits recoverable for package dress infringement, notwithstanding that it may have been wholly or partly unearned at close of accounting period.

5. **Trade-marks and trade-names and unfair competition ⟨⟩98—Package dress infringer, on accounting, held entitled to deduction of 45 per cent. of face value of profit-sharing coupons issued.**

On accounting for profits of package dress infringement, evidence *held* to establish that infringer was entitled to deduction for 45 per cent. of face value of profit-sharing coupons issued with infringing article.

6. **Trade-marks and trade-names and unfair competition ⟨⟩98—On accounting for profits of package dress infringement, income and excess profits taxes will be deducted in amount which injured party would have paid, if receiving profits.**

On accounting for profits of package dress infringement, federal income and excess profits taxes are deductible in proportion to amount that injured party would have paid, if profits had been received as they accrued.

7. **Trade-marks and trade-names and unfair competition ⟨⟩98—Deduction may be had on accounting for profits of infringing package dress for interest on invested capital.**

On accounting by infringer for profits of infringing package dress, deduction may be had for interest on invested capital.

8. **Trade-marks and trade-names and unfair competition ⟨⟩98—On accounting for profits of package dress infringer, deduction for interest on investment held sufficient, under circumstances, to cover depreciation in value of patents.**

On accounting for profits by infringer in sale of article in infringing package dress, allowance of interest on investment *held*, under circumstances, a sufficient deduction for depreciation in value of patents, in absence of evidence of depreciation beyond that afforded by flight of time.

9. **Trade-marks and trade-names and unfair competition ⟨⟩98—Accounting for profits of package dress infringement held not to extend to profits of separate foreign corporation, not party to action.**

Accounting for profits of package dress infringement should not extend to foreign corporation, organized for purpose of carrying on business there, and constituting a distinct entity, organized in good faith, and not a party to action.

10. **Trade-marks and trade-names and unfair competition ⟨⟩98—Accounting expense incured by complainant is not allowable, where package dress infringer filed account, omitting no important data (equity rule 63).**

Where accounts filed by package dress infringer omitted no important elements of sales, manufacturing costs, and gross profits, accounting expense incurred by injured party was not allowable, on theory that account filed was not that contemplated by equity rule 63.

11. **Trade-marks and trade-names and unfair competition ⟨⟩98—Interest at 5 per cent. from date of master's report held sufficient on accounting for profits of package dress infringement.**

On accounting for profits in sale of article in infringing package dress, award of interest on amount due at 5 per cent. from date of master's report *held* sufficient to fully compensate injured party.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois; James H. Wilkerson, Judge.

Suit by the William Wrigley, Jr., Company against the L. P. Larson, Jr., Company, wherein defendant counterclaimed. From the decree (5 F.[2d] 731), both parties appeal. Remanded, with directions.

Chas. H. Aldrich and Geo. I. Haight, both of Chicago, Ill., for L. P. Larson, Jr., Co.

Wallace R. Lane and Isaac H. Mayer, both of Chicago, Ill., for William Wrigley, Jr., Co.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

ALSCHULER, Circuit Judge. Both parties appeal from a decree which awarded L. P. Larson, Jr., Company (herein called Larson) $1,384,649.12, as net profits on sales by Wm. Wrigley, Jr., Company (herein called Wrigley) of the latter's brand of "Doublemint" gum sold in package dress held by this court to have infringed Larson's "Wintermint" gum package. The decree for the accounting was awarded pursuant to the direction of this court as made in Larson, Jr., Co. v. Wrigley, Jr., Co. (C. C. A.) 253 F. 914. During the accounting certain questions arose, which were brought to, and considered and determined by, this court. In re Larson, Jr., Co. (C. C. A.) 275 F. 535. The facts leading to these adjudications, together with quotations from those opinions here applicable, and the propositions there and here in controversy, are clearly and sufficiently set forth in Judge Wilkerson's opinion disposing of exceptions by Wrigley to the master's report. Wrigley, Jr., Co. v. Larson, Jr., Co. (D. C.) 5 F.(2d) 731. The thousands of pages of evidence taken before the master, the near 1,500 pages of briefs submitted here, with indexed citations (including duplications) of over 800 cases, have imposed on us a task of no mean proportions, in considering the various more or less complicated questions.

At the threshold we are met with the question of the scope of the accounting under the decree—whether Wrigley must account for all sales of "Doublemint" in the infringing dress, or only such as were made in territory wherein Larson competed with Wrigley, and incidentally whether Wrigley was entitled to show that "Doublemint," however in the infringing dress, was sold with knowledge on the part of purchasers that it was Wrigley's product, or whether the sales were made because of the superiority of the Wrigley product, and faith in the Wrigley name, and to no extent because of Larson's standing or reputation in the trade.

[1, 2] We are in accord with Judge Wilkerson's reasoning and conclusion that the decisions of this court determined the law of the case thereon, and that the accounting was to be for profits arising from all the sales— meaning, of course, the net profits. The consolidated causes involved in the first appeals had been fully heard upon their merits, and, pursuant to the reversing and remanding order for decree on Larson's counterclaim, the District Court entered its decree for an accounting for all the profits, and, if there remained any question as to the law of the case in this regard, it was settled by this court upon the subsequent appeal and mandamus proceedings here. (C. C. A.) 275 F. 535.

But, apart from the proposition of the law of the case, we are satisfied that under the very exceptional circumstances here appearing Wrigley is in no position to claim that Larson did not compete, and was an unknown factor in much of the territory wherein "Doublemint" was sold. The forestalling and oppressive tactics employed by Wrigley, for the purpose of eliminating Larson as an actual or potential competitor, cry out against Wrigley's urging in defense the success of these very tactics. Wrigley may not thus lawlessly clip Larson's wings, and escape liability for the profits of its appropriation of Larson's package dress on the plea that Larson could not fly.

If the rule contended for by Wrigley were here to prevail, it is apparent that little or no proof could be made of substantial profits, or damages either. It would be manifestly impossible, even if the infringement were of the "Chinese copy" variety, to show that, but for the sale of Wrigley's "Doublemint" in the infringing dress, the individual users would have purchased Larson's "Wintermint." Even if in a few instances this might be done, it would be humanly impossible, even though the effort and expense were not prohibitive, to have sought out and produced the evidence from any considerable number of users. Neither could it be known into what territory Larson would have pushed its trade, but for Wrigley's oppressive and forestalling practices. The entrant into a field of endeavor might, thus early in his business career, be throttled and eliminated from competition, and his distinctive trade dress seized and used by a powerful opponent, with no measure for affording

adequate relief. The more flagrant, and therefore the more effective, the invasion of another's rights, the more certain and complete would be the invader's immunity. Injunctive relief may be sufficient for the future, but the invasion, during the years of litigation to secure it, must be otherwise dealt with.

Under all the circumstances, we do not see how, in this case, a measure of recovery less than award of the entire net profits from the use of the infringing package would afford due measure of reparation. That an award on this basis might permit recovery of a larger sum than would likely have been the net profits of the injured party, if left undisturbed, is an incident of the invasion of which this invader is not in position to complain. The account which Wrigley filed with the master showed for the accounting period (July 28, 1914, to December 2, 1918) total sales of all brands of gum (except in Canada and Australia) of nearly $57,000,000, of which the total of "Doublemint" in the infringing dress was almost $9,000,000, and the gross profits attributable to "Doublemint" $5,152,689.32. As to these figures there is no controversy.

The contested issues on the accounting arise over allowance or rejection of various items claimed by Wrigley in reduction of this gross "Doublemint" profit. The first Wrigley account filed showed items which indicate for the entire accounting period some loss on "Doublemint." A supplemental account, later filed on its behalf, introduced additional items in reduction, which show much greater loss for the period.

### Advertising.

The item of most importance, and perhaps most sharply controverted, is that of advertising. For years prior to putting out the "Doublemint" brand Wrigley was an extremely heavy advertiser, and before placing "Doublemint" on the market had established a large trade in gum—"Spearmint" being its specially advertised brand. On putting out the "Doublemint" brand, a very heavy and extensive advertising program was inaugurated, and for a considerable time "Doublemint" was greatly stressed. The previously heavily advertised ."Spearmint" continued also to be much advertised, and later the policy seemed to be to put special stress on the name "Wrigley," but including both "Doublemint" and "Spearmint" in the advertising matter. Still later in the period Wrigley brought out the "Juicy Fruit" brand, and advertised it with the rest, though not so extensively as "Double-

mint:" The total expended during the accounting period for advertising, such as newspaper, magazine, bill board, street car advertising, electric signs, and the like, was $6,798,662.73.

[3, 4] Intricate computations of the advertising items were made, each on a different basis, for allocating to "Doublemint" its proper proportion of these items. Wrigley's accountant assigned to "Doublemint" $2,872,844.43, while Larson's accountant fixed it at $1,017,183.59. The master worked out a complicated system whereby a very considerable portion of the advertising was charged up as "institutional," to be amortized in four years; that is, one-fourth of the cost to be charged off for each year as the expense for that year of such advertising. In this way alone much of the advertising expense for the last three years of the period was projected forward; for example, for an "institutional" advertisement for the last year of the accounting period only one-fourth would be charged against the gross profits for that period, and three-fourths projected beyond that period, upon the theory that the advertisement, though contracted and paid for in the first-year, will be effective as an advertisement for four years, and that such future benefit will accrue to Wrigley as an institution. We cannot accept as practically probable the proposition that an advertisement is as potent throughout a four-year period as during the year of its publication. And this applies, in large measure, as well to much of the more permanent forms of advertising, such as billboards and electric signs. In time even these become obsolete and stale, and from time to time are renewed or changed, to say nothing of the cost of upkeep. Besides, all of that part of the advertising cost attributable wholly to the infringing "Doublemint," which remained unearned at the close of the accounting period, became lost to Wrigley through the injunction. Nevertheless, the expense for this advertising had been contracted and paid for in good faith, and however it may have been wholly or partly unearned at the close of the accounting period, it was none the less an expense which should be deducted in fixing the net profits on "Doublemint." Where the injured party seeks the profits of an infringer, he takes the chance of their reduction, or even extinguishment, through expenses and losses actually incurred, however unwisely or even improvidently, so long only as they were incurred in good faith.

Our investigation of the record and consideration of the briefs convinces us that

far too large a part of the advertising expense was, by the master's report, accredited to the future, and not sufficient to the accounting period, and that much too small a part of the entire advertising costs was attributed to "Doublemint." To undertake the allocation of each of the almost innumerable items of advertising to the various brands, and to "institution," would be indeed a most difficult task, and one wherein certainty would not, in the nature of things, be possible. But laborious examination of the many advertisements appearing in the transcript, and of the numerous tables, charts, graphs, and computations thereon, and the evidence concerning them, together with the very elaborate arguments of counsel submitted on the subject, and the report of the master and the opinion of the District Judge, satisfies us that the conclusions and findings and figures reached by the District Court upon the subject of advertising far more nearly comport with the approximate equity between these parties than those the master reported. Upon this item we quite despair of reaching a result more equitable than that reached by the District Court, and we see no reason for disturbing its conclusions thereon, as carried into the decree.

### Contingent Liability for Unredeemed United Profit-Sharing Coupons.

[5] On this item the master charged against "Doublemint" gross profits $98,519.06, which the District Court increased by $64,715.60. With each 5-cent package of gum there was inclosed a profit-sharing coupon good for one-fifth of a cent, and also coupons of larger denomination with cartons of gum packages. The coupons were exchangeable either for cash or merchandise, and unlimited as to time of presentation. Many millions were put out each year. Their redeemability in articles of merchandise of various kinds was an incentive for saving them until sufficient quantities accumulated to effect a desirable exchange. Of course, many became lost and will never be redeemed. As to those actually redeemed, no question arises. The dispute comes respecting those not redeemed, which continue to be a potential liability of Wrigley, since Wrigley must pay the profit-sharing company on the basis of $3 for each 1,000 of one-fifth cent coupons presented. Evidence was offered of the experience of others who had for many years given out such coupons with their merchandise. There was evidence of very substantial redemptions for many years after their issuance. It appears that the government, in the computation of profits, allowed Wrigley 60 per cent. of the face value of the coupons issued in each year as fairly representing this liability. The master's allowance was based on a 33⅓ per cent. of such redemption, which the District Judge raised by 5 per cent. From a careful review of the situation, we are satisfied that the percentage of redemption allowed by the court is still too low, and ought to be somewhat further increased. In our judgment an additional 6⅔ per cent. over and above the further allowance by the District Court, making in all 45 per cent., probably would not overestimate Wrigley's ultimate liability upon the unredeemed coupons, and we are of opinion that this charge against "Doublemint" gross profits should be increased accordingly.

### Federal Income and Profits Taxes.

Wrigley's account, as first filed, claimed for this item $563,933.89 attributable to "Doublemint" profits; in the supplemental account filed, it was stated at $621,108.97. The master states that these figures so claimed are on the basis that the "Doublemint" profits were the last to be made and should bear the highest rate of tax, but states that this theory was afterward conceded to be improper, and that the "Doublemint" share of federal taxes, on the basis of the proportion of profits, would be $372,942.09. Both master and court refused to allow any such tax in reduction of the profits, and the decree represents no deduction for such taxes paid by Wrigley.

We do not understand why federal income and excess profits taxes paid by a corporation are not a proper item of expense to be charged against the gross profits for the year, in the ascertainment of what the net profits for such year were. If, instead of only the "Doublemint" profits, Larson were held entitled to receive from Wrigley the entire net profits of the Wrigley business, can it be doubted that there would be deducted from the gross profits the federal income and excess profits taxes which Wrigley had paid? This might be simple enough in a case where the accounting was for the net profits of an entire business. But is the principle any different where the liability is for only a part of the net profit?

It is stated, both by the master and the District Judge, that Larson would, in any event, have to pay federal income tax on the amount decreed, for the year in which the decree was paid. This might be so in some cases. But if it appears that the amount decreed is only what is left after

20 F.(2d)—53

reimbursement to Wrigley of the federal tax already paid thereon, it is unthinkable that collection of the same tax from Larson would be again undertaken.

Moreover, the very theory on which Larson may recover these net profits from Wrigley is that Wrigley, in handling the infringing "Doublemint" gum packages, did so as Larson's trustee or agent—albeit ex maleficio. While equity requires in such circumstances accounting for the profits, equity also allows in reduction outlays in that behalf made in good faith; and what outlay more necessary—yea, compulsory—than the federal income and excess profits tax? If an agent, conducting business for an absent principal, pays such tax on the profits, should the principal be required to pay another such tax if and when he collects the balance due him from the agent? Surely this ought not to be.

The master reasoned that, if required to pay the net profits, unreduced by "Doublemint's" fair proportion of the tax, Wrigley could deduct the whole amount paid from subsequently returned profits taxes. This would scarcely meet the situation. There may be no profits adequate therefor, in which event the tax thus paid would be lost to Wrigley. But, in any event, we do not think it would be equitable as between these parties to require Wrigley to pay back the full net profits without any reduction for this tax, on the faith that somehow and somewhere and sometime it will be refunded.

In dealing with a comparable situation, Judge Rose said: "Where the owner of the patent seeks to charge the infringer, as a trustee, with the profit made, no arbitrary rule should require him to turn over a sum greatly exceeding any profit the law has allowed him to keep for himself. Only equity can award profits, and, in equity, equity must be done." Sly Mfg. Co. v. Pangborn Corp. (D. C.) 276 F. 971. The Circuit Court of Appeals specifically approved this reasoning. Id. (C. C. A.) 284 F. 217.

While not undertaking to lay down a hard and fast rule for fixing the amount of such tax deduction, we venture some suggestions thereon. It is contended for Wrigley that, since the Wrigley profits for the rest of the business carried the Wrigley taxes into the highest bracket, the additional tax on account of the profit attributable to "Doublemint" was likewise taxable at the highest rate, and that the deduction from the profits attributable to "Doublemint" should be fixed at such rate. There would be more in this contention if Larson's excess profits taxes for the years in question likewise reached into the highest bracket, so that further profit would likewise have carried the highest rate.

But, if this is not the fact, it would not be equitable to require Larson to pay at a higher rate than that at which it would have paid, if the net profits had been paid by Wrigley to Larson as they accrued, and before Wrigley had paid any tax thereon. In undertaking to avoid inequity toward Wrigley, inequity should not be done Larson, through requiring Larson to bear a higher tax than would have been collectible, had the profits been paid over as earned.

[6] It occurs to us that the total net profits awarded Larson (without deduction for federal income and excess profits taxes) should be allocated, as nearly as may be, to each year during the accounting period in which they were earned, and that, considering such amounts for each year as additional net profit to Larson in such year, the added amount of income and excess profits tax thereon which Larson would have had to pay should be estimated, as nearly as may be done; the aggregate of such yearly additional tax which Larson would thus have been required to pay, to be deducted from the profits on "Doublemint" as found. Larson would thus be paying only the taxes it would have paid, had it received the profits as they accrued, and Wrigley will have credit at once for the taxes thus paid on Larson's profits. True, this might leave Wrigley out of pocket to the extent that its payment at the highest rate on "Doublemint" profits exceeded the amount at any lower rate at which Larson would have been charged; but this is not Larson's fault, and if, as between the two, one must suffer, it should be Wrigley, who brought about the condition. Whether or not Wrigley might then have a collectible claim against the government, through having paid at a higher rate upon the profits to which Larson was entitled, and which Larson thus actually paid at a lower rate, is not here involved.

Possibly difficulty will be experienced in allocating the net profits awarded (exclusive of deduction for these taxes) to the different years of the accounting period. While it may be this cannot be accurately done, it should be approximated as nearly as the nature of the case will admit. Of course, nothing here said has application to whatever, if any, liability for income tax may accrue to Larson on account of payment, when made, of interest on the award. We are of opinion that the amount of this tax attributable to the net profit on "Doublemint" should be

ascertained under the direction of the District Court, and the award to Larson reduced accordingly.

### Interest on Invested Capital.

[7] Under this heading the District Court allowed a deduction of $259,120.54 from gross profits for interest on investment in tangibles, and $45,260.79 for interest on investment in patents and patent rights. The master's report refused all allowance for such interest. As pointed out in Judge Wilkerson's opinion, this court is committed to the principle that in such cases interest on invested capital should be deducted. No valid reason appears to us why the amounts which the court fixed are not proper. There was evidence that the gum-making machinery covered by the patents which Wrigley acquired was in constant and profitable use in the Wrigley factories during the infringing period, and, to the extent of Wrigley's actual investment in such patents, it is not apparent to us why a fair proportion of interest thereon attributable to "Doublemint" should not be deducted from the gross profits, as well as the interest on investment in tangibles. We are in accord with the District Court's disposition of these items.

### Interest on Wrigley's Invested Profits.

We are likewise satisfied with the treatment by the District Court of this item, and see no reason for disturbing it.

### Depreciation of Patents.

[8] For this Wrigley claims reduction of an amount applicable to "Doublemint," at the rate of one-seventeenth of the value of the patents for each year of the accounting period, as applied to all the brands, upon the theory that this proportion of the life of the patent expired each year. There was no evidence of depreciation beyond that afforded by the flight of time. It might well have been the case that the patents did not depreciate in value, but that, in fact, they appreciated, depending quite wholly upon conditions other than the expiration of a portion of a period of their grant. We believe the allowance of interest on the investment in the patents is, under all the circumstances, a sufficient charge against profits on account of the patents.

### Profits of Canada Corporation.

[9] The District Court properly found that the accounting should not extend to the profits of this corporation. It was organized in Canada for the purpose of carrying on the gum business there; and while its stockholders were also Wrigley stockholders, and it handled there the Wrigley brands in very much the same manner as they were handled in the United States, it was a distinct entity, organized admittedly in good faith, and was not a party to this action.

### Accountants' Fees.

The master recommended the allowance of the fees of Touche, Niven & Co., accountants, for $17,591.21 for their services. The court in its opinion disallowed the fees as costs, but gave no reason. There is nothing in the decree thereon, and so far as this may be regarded an adjudication we consider the item, and the very full discussion thereof in the briefs and arguments. The decree of the District Court authorized the master to employ accountants, which he did, and their fees of $7,359.50 have been properly ordered allowed as costs. Each party additionally employed its own accountants—Touche, Niven & Co. by Larson. The master's recommendation of allowance was upon the theory that the account filed by Wrigley was not correct, and not such an account as was contemplated by equity rule 63. It is true that the accounts filed showed for the accounting period a substantial loss on "Doublemint." The very important elements of sales of "Doublemint," manufacturing costs, and gross profits were accepted without dispute, and likewise substantially all of the item of nearly $1,000,000 for overhead expenses. The loss shown is made to appear from items, the allowance or disallowance of which was influenced rather by the correct principle to be applied, than by falsity in the disclosure.

[10] As to the most important item, advertising, there was no dispute as to amounts paid, but as to their allocation. Wrigley asserted that something over $2,800,000 should be charged to "Doublemint." Touche, Niven & Co. reported slightly over $1,000,000 as so applicable. Various theories of allocation were put forth—proportion of sales, space method, brand advertising, and institutional advertising. To elaborate each of these, with the exception of the first, involved investigation and computation of vast data. Such data as Wrigley had were without objection or concealment at the disposal of all concerned. Then there was Wrigley's contention of nearly $300,000 for interest on good will, which was rejected, and for federal income tax, which was also disallowed, and certain other items claimed, the allowance of much of which would indeed have wiped out all the profit on "Doublemint." The fact that

such were claimed as deductions from the gross profits which were truly disclosed, was not, in our judgment, such a transgression of equity rule 63 as to have warranted the allowance against Wrigley of this item of accounting expense, and the court properly disallowed it.

### Interest on Award.

The master recommended allowance of interest on the award on his finding of net profits at the rate of 6 per cent. per annum, from the end of the accounting period, December, 1918. The decree adopted the same rate, but fixed as the beginning date for interest on the award, the filing of the master's report, November, 1923. In a number of cases of accounting for infringement of patents, this court has allowed interest from date when infringement ceased. B. F. Goodrich Co. v. Consolidated Rubber Tire Co. (C. C. A.) 251 F. 617; Malleable Iron Range Co. v. Lee (C. C. A.) 263 F. 896; Superior Tool Machine Co. v. Cincinnati Lathe & Tool Co. (C. C. A.) 284 F. 267; Starr Piano Co. v. Auto Pneumatic Action Co. (C. C. A.) 12 F.(2d) 586.

In the first three of these cases the award was for damages, the first two predicated on reasonable royalty, and the third on lost profits. In these the power of the court to award additional damages up to treble the amount found is given by statute in cases of infringement of patent, and the court has discretion to increase the damages found, whether by the name of interest or otherwise; and in the last case cited the discretion to award damages where profits were allowed, was justified, not only upon the prior cases, but further upon Miller v. Robertson, 266 U. S. 243, 45 S. Ct. 73, 69 L. Ed. 265. This was not a suit for infringement of patent, but involved damages for breach of a contract, and from this case the opinion in the Starr Piano Company Case quotes this sentence: "When necessary, in order to arrive at fair compensation, the court, in the exercise of a sound discretion may include interest or its equivalent as an element of damages," the inference being that in the Starr Piano Case carrying back the interest was deemed proper to arrive at fair compensation.

The principle is not new. It was old even in Tilghman v. Proctor, 125 U. S. 136, 8 S. Ct. 894, 31 L. Ed. 664, where the court, upon a similar question, said: "If the question thus presented were a new one, it would require grave consideration. But by a uniform current of decisions of this court, beginning 30 years ago, the profits allowed in equity, for the injury that a patentee has sustained by the infringement of his patent, have been considered as a measure of unliquidated damages, which, as a general rule, and in the absence of special circumstances, do not bear interest until after their amount has been judicially ascertained [citing cases]. Nothing is shown to take this case out of the general rule. * * * Interest therefore should be allowed * * * only from the day when the master's report was submitted to the court." This case, while recognizing the general rule, does not exclude the discretion of the court to allow interest back of that date, where "special circumstances" may justify. In the recent patent infringement accounting case of National Tube Co. v. Mark (C. C. A.) 10 F.(2d) 430 (6 C. C. A.), where damages were fixed on a reasonable royalty basis, the court, considering the question of interest, while stating that it was usual to allow it only from date of master's report, exercised its discretion to make further allowance under the particular facts of that case by awarding further interest for half the time between date of infringement and date of master's report. [11] It must be remembered that in the appeals here there is not involved a patent, or a statutory trade-mark, and that any rules peculiar to such do not of necessity apply in fixing interest; but the usual practice of computing interest in an accounting from the date of the master's report, prevails, unless, as indicated in the cases cited, circumstances require an earlier beginning date. The award here in issue is so palpably and unquestionably ample to fully compensate Larson for any and all invasion of its rights, as to suggest no circumstances which invoke the court's discretion to enlarge it by allowance of interest back of the date of the master's report, a condition which, in our judgment, likewise forbids an interest rate above 5 per cent.

We do not deem it necessary to present further discussion of questions raised in the briefs, especially such as were considered and determined in Judge Wilkerson's opinion. We approve the decree of the District Court in all respects, save as to the items of United Profit-Sharing Coupons, federal income and excess profits taxes, and rate of interest upon the award; and in order that the decree may be made to conform with our views as above stated respecting these items, and to take further evidence, if deemed necessary, respecting the item of federal income and excess profits taxes, and to make further deductions accordingly from

the award as made, the cause is remanded to the District Court, with direction further to proceed, and to enter a decree in consonance with these views.

The costs in this court of these appeals shall be divided equally between the parties.