429 F.2d 873
 Harry P. LOCKLIN and Elmer J. Brandt, d/b/a Radiant Color Company, Counter-Plaintiffs, Appellees, and Cross-Appellants,
v.
DAY-GLO COLOR CORPORATION (formerly Switzer Bros., Inc.), Robert C. Switzer, and Joseph L. Switzer, Counter-Defendants, Appellants, and Cross-Appellees.
 No. 17730.
 No. 17731.
 United States Court of Appeals, Seventh Circuit.
 June 26, 1970.
 Rehearing Denied September 15, 1970.
 
 1
 Charles L. Michod, Chicago, Ill., Carl Hoppe, San Francisco, Cal., for Locklin.
 
 
 2
 Samuel W. Kipnis, Chicago, Ill., Thomas V. Koykka, Arter & Hadden, Thomas J. Gray, Cleveland, Ohio, for Day-Glo Color Corp., and others.
 
 
 3
 Before SWYGERT, Chief Judge, KILEY, Circuit Judge, and GRANT, District Judge.*
 
 GRANT, District Judge:
 INTRODUCTION
 
 4
 In these cases, Day-Glo Color Corporation, et al., (hereinafter "Switzer") appeal, and Locklin and Brandt (hereinafter "Radiant") cross appeal, from the district court's judgment. We affirm.
 
 HISTORY
 
 5
 The parties compete in the daylight fluorescent materials market. The two types of products involved are liquid colors (variously known as silk screen colors, wet colors, paint, and ink) and paper coated with fluorescent colors.
 
 
 6
 On 20 October 1948 Switzer began its United States licensing program, the first successful step in the commercial exploitation of patent rights, culminating fifteen years of preparatory work. Radiant, after two years of preparation, entered the business on 1 January 1949.
 
 
 7
 On 5 June 1952 Switzer began this case in the district court as a patent infringement suit against sixteen of Radiant's customers, including the Chicago Cardboard Company. Seven months later Radiant was allowed to intervene as a party defendant and on 19 February 1954, after this court reversed the district court's denial of leave,[1] filed an anti-trust counterclaim charging violation of 15 U.S.C. §§ 1, 2, and 14.
 
 
 8
 Several years later Switzer encountered rough going in its similar patent infringement suit against another Radiant customer in Ohio. The Ohio suit was dismissed for failure to join indispensable parties, co-owners of the patent in issue.[2] The court below gave Switzer the same treatment in the Illinois suit and we affirmed. Switzer Bros., Inc. v. Chicago Cardboard Co., 252 F.2d 407 (7th Cir. 1958).
 
 
 9
 The cause now before us then went to trial on Radiant's amended counterclaim and Switzer's counterclaim against Radiant, culminating in the 12 August 1960 judgment that Switzer, without malice or bad faith, violated the anti-trust laws. Switzer's counterclaim was dismissed for lack of evidence. We affirmed.[3] The district court, on 14 June 1962, referred the case to a special master to report on damages as enumerated in the findings,[4] costs expended, and the amount of reasonable attorney fees.
 
 
 10
 The master began hearing evidence on 31 March 1964. Subsequently Radiant was rebuffed by the district court in its effort to file a supplemental counterclaim on the ground that the issues sought to be raised had been litigated elsewhere. We affirmed the district court's denial of leave to file the supplemental counterclaim.[5]
 
 
 11
 Six years after the reference, during which time forty-three days were spent in presenting evidence and argument, the master filed his report of over two hundred and thirty-one printed pages, based upon nine thousand pages of documents and testimony concluding that Radiant was damaged in the amount of $1,145,378.73.[6] Over objection, the district court entered judgment for that amount. The parties, for the fifth time, appeal here.
 
 STANDARD OF REVIEW
 
 12
 The parties are entitled to a real review to determine whether or not the factual findings are clearly erroneous. Becker v. Loew's, Inc., 133 F.2d 889 (7th Cir.), cert. denied, 319 U.S. 772, 63 S.Ct. 1438, 87 L.Ed. 1720, rehearing denied, 320 U.S. 811, 64 S.Ct. 30, 88 L.Ed. 490 (1943). Although the master's findings of fact are binding on the district court unless clearly erroneous, Rule 53(e) (2), Fed.R.Civ.P., that rule is not "an invitation to abdicate the judicial function upon receiving a master's report." Krinsley v. United Artists Corp., 225 F.2d 579, 583 (7th Cir. 1955). It is incumbent upon us to determine whether or not the district court correctly applied the clearly erroneous test to the master's findings of fact.
 
 THE CROSS APPEAL
 
 13
 Radiant, on cross-appeal, raises two issues. First, we are asked to decide that the judgment, expressed in dollars, is erroneous for lack of an upward adjustment equivalent to the inflationary shrinkage occurring since the 1950's, the time during which damage was actually sustained, until the entry of judgment.
 
 
 14
 There are some cases where inflation was considered as a factor in assessing damages, see e. g., Waterman S. S. Corp. v. Dean, 171 F.2d 408 (4th Cir. 1948), cert. denied, 337 U.S. 924, 69 S.Ct. 1168, 93 L.Ed. 1732 (1949) [salvage]; many cases where dollar value is simply ignored, see e. g., Bates v. United States, 108 F.2d 407 (7th Cir. 1939), cert. denied, 309 U.S. 666, 60 S.Ct. 591, 84 L.Ed. 1013 (1940) [tax refund suit]; and a host of cases where inflation is used to demonstrate why a trial court committed no error in refusing to order a remittitur when a damage award, compared to past cases, seems high, see e. g., Virginian Ry. Co. v. Rose, 267 F.2d 312 (4th Cir.), cert. denied, 361 U. S. 837, 80 S.Ct. 89, 4 L.Ed.2d 77 (1959) [personal injury]. We are unable, however, to find any authority requiring, or even allowing, the increase of a damage award, once found, to offset the decreased value of the dollar.
 
 
 15
 Nor can Radiant successfully contend that the master erred in failing to consider inflation to arrive at the damage figure on the ground that this is customary in other types of "tort" situations and that the lack of a consumer price index adjustment deprives it of property without due process of law. Both of these arguments can be met with the single observation that Radiant's 1950 economic losses, awarded in 1960 dollars, were trebled.[7]
 
 
 16
 Radiant next asks that interest run, not only from the date of judgment, 13 March 1969, but also from the date the master's report was filed, 3 June 1968. Interest is not enumerated as a recoverable item in the statute, 15 U.S.C. § 15. Recovery of it is therefore precluded. Cf. Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945).[8] Radiant is then relegated to the general interest statute, 28 U.S.C. § 1961, which allows interest on a money judgment only from its entry date. The judgment on cross appeal must be affirmed.
 
 THE APPEAL
 
 17
 Switzer presents five main points in support of its position that the judgment must be reversed, in whole or in part.
 
 A. The Settlement
 
 18
 Radiant brought a suit similar to this one in California on 21 October 1955 charging Switzer, Sherwin-Williams, one of its subsidiaries, and another, with conspiracy to violate the anti-trust laws. The case was terminated by the granting of Radiant's motion to dismiss on 25 August 1960. Switzer says that Radiant should have no damages here because the latter released its claim against Sherwin-Williams in the California conspiracy suit without a reservation of rights against remaining tortfeasors who committed the same tortious acts,[9] even if they were not sued,[10] even if no written release were signed,[11] and regardless of plaintiff's intent.[12]
 
 
 19
 Reliance is had upon the following facts, as found by the master: The California conspiracy suit involved the same wrongs here asserted, Sherwin-Williams would do no business with Radiant until the law suit was dismissed, the former making it clear that a one-year supply contract for Radiant's pigments would be waiting upon dismissal, Radiant dismissed the suit "in anticipation" of the supply contract, and the contract was executed.
 
 
 20
 The record, however, reveals at least two additional critical facts, viz., Locklin denied any settlement agreement, and the supply contract was the third in a series. This sufficed, as both the master and the district court noted, to put the matter in dispute.
 
 
 21
 Switzer of necessity must argue that the facts surrounding dismissal of the California suit show, as a matter of law, that the dismissal was the quid pro quo for the supply contract. Put another way, that the supply contract was the satisfaction for the wrongs Radiant alleged it suffered. The facts, of course, show no such thing. Switzer's conclusion is merely an inference to be drawn from the facts. The master, on both direct and circumstantial evidence, drew another inference — that while Radiant hoped to get the Sherwin-Williams contract, its dismissal of the California suit was not the consideration therefor. The master's factual determination was not clearly erroneous, and we must affirm on that basis, having no need, therefore, to pass on the validity of the legal propositions urged by Switzer.
 
 B. Treble Damages
 
 22
 Both the district court and this court have found that Switzer's antitrust violation was without malice or bad faith. Switzer Bros., Inc. v. Locklin, 297 F.2d 39, 49 (7th Cir. 1961), cert. denied, 369 U.S. 851, 82 S.Ct. 934, 935, 8 L.Ed.2d 9 (1962). Although the controlling statute says that one injured by reason of an anti-trust violation "shall recover threefold the damages by him sustained * * *," 15 U.S.C. § 15, Switzer asserts that it was error to treble damages here. Reliance is had upon two cases, Rogers v. Douglas Tobacco Bd. of Trade, Inc., 244 F.2d 471 (5th Cir. 1957), and Haskell v. Perkins, 28 F.2d 222 (D.N.J.1928), rev'd on other grounds, 31 F.2d 53 (3rd Cir.), cert. denied, 279 U.S. 872, 49 S.Ct. 513, 73 L.Ed. 1007 (1929), both of which hold that damages need not be trebled in every case. Sun Theatre Corp. v. R.K.O. Radio Pictures, Inc., 213 F.2d 284 (7th Cir. 1954) holds that anti-trust damages must be trebled. We are asked to reassess Sun Theatre and hold that the statute does not require the trebling of damages "willy-nilly."
 
 
 23
 Both Rogers and Haskell involved anti-trust suits against defendant estates. The courts there were reluctant to fashion punitive sanctions upon the representatives of a tortfeasor who could not be "rehabilitated" or offered as a deterrent example. There was no personal representative in Sun Theatre nor is there one here. The cases are clearly distinguishable and thus present no conflict in need of resolution. To the extent that Sun Theatre conflicts with Rogers and Haskell, we adhere to our Sun Theatre decision on this issue. The trebling of the damages found to have been incurred was not error. It was required by law.
 
 C. Excessive Attorney Fees
 
 24
 Switzer next complains of the attorney fees award, characterizing it as excessive. Attorney fees account for $198,201.00 of the total award, approximately $7,700.00 for combating propaganda, $30,000.00 for defense of the complaint filed herein, and $75,000.00 for prosecuting the counterclaim to judgment.[13]
 
 
 25
 The fees awarded for combating propaganda is said to be excessive except for $1,200.00 because it was based on schedules made up a decade after performance of the services. We know of no rule which requires the master to make a finding only on contemporary records and in any event the schedules relied upon were compiled from contemporary records.
 
 
 26
 Switzer next argues that $30,000.00 is too much for defending the complaint because it was dismissed for failure to join an indispensable party and adequate records were not preserved.
 
 
 27
 Radiant quite correctly points out that this case proceeded on the patent infringement complaint for more than four years before it was dismissed. During this time Radiant was preparing for a full-scale lawsuit. It finally learned, quite by accident, and despite previous requests for and denial by Switzer, of documents revealing that there were other non-joined owners of the patent. It will not do for Switzer to now contend that Radiant should have done nothing to prepare its defense against the former's patent infringement claims because it could have waited for evidence to support a motion to dismiss. The delay and expense was owing to Switzer. It must now pay the price.
 
 
 28
 Any argument that there is insufficient proof to justify the award is simply without merit. The fact that Radiant did not keep exquisitely detailed records cannot be cause for complaint when the records produced would have justified an award in excess of $50,000.00. $30,000.00 was reasonable and not clearly erroneous.
 
 
 29
 Undaunted, Switzer assails the $75,000.00 award for prosecuting this counterclaim on the grounds that it is excessive, unsupported by contemporary records, constituted compensation for effort spent on unnecessary issues, and that it is barred by Section 4 of the Act, 15 U.S.C. § 15, because Radiant's attorney worked under a contingent fee contract.
 
 
 30
 We think the award not excessive. It was adequately supported by documentary evidence and, although we might say as a matter of hindsight, that some of the legal services now appear to have been unnecessary, we would be hard put to characterize them as manufactured damages.
 
 
 31
 Farmington Dowel Products Co. v. Forster Mfg. Co., 297 F.Supp. 924 (D. Me.1969) holds that a contingent fee arrangement bars an award of attorney fees under Section 4 of the Act. It is sufficient to note that both this court, cf. Milwaukee Towne Corp. v. Loew's, Inc., 190 F.2d 561 (7th Cir. 1951), cert. denied, 342 U.S. 909, 72 S.Ct. 303, 96 L.Ed. 680 (1952), and the First Circuit Court of Appeals, Farmington Dowel Products Co. v. Forster Mfg. Co., 421 F.2d 61 (1st Cir. 1969), reversing in part, 297 F.Supp. 924 (D.Me.1969), disagree. The attorney fees award was proper.
 
 D. Lost Sales
 
 32
 The largest items of damage found by the master were Radiant's losses of net profits.[14] Switzer, understandably, makes a furious attack on both the lost sales and rate of profit figures. Turning to the first element, the lost sales figure, Switzer gives five reasons why the master's determination thereof is unsupportable. They are: 1) Radiant did not meet its burden of proof; 2) Switzer did not cause Radiant to lose sales; 3) lost sales should not have been computed for certain years; 4) it was error to use gross instead of net sales; and 5) Radiant's experts made estimates which are beyond redemption.
 
 
 33
 1. The Burden of Proof. Obviously a case such as this does not admit of precise proof. Radiant was attempting to prove sales it did not make. To be sure a finding may not rest on guess or speculation, Bigelow v. R.K.O. Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Assoc. Press v. Taft-Ingalls Corp., 340 F.2d 753 (6th Cir.), cert. denied, 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965). On the contrary, a plaintiff must prove the amount of damages by a preponderance of the evidence. Such proof need not be direct but may, instead, be circumstantial, Keough v. Chicago & N.W. Ry., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), even to the point of estimates based upon assumptions, provided that the assumptions rest upon an adequate base, Herman Schwabe, Inc. v. United States Shoe Machinery Corp., 297 F.2d 906 (2d Cir.), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962). Damages may not be awarded on the basis of conjecture and speculation and the admitted fact of damage is insufficient to prove the amount of damage, Clapper v. Original Tractor Cab Co., 165 F.Supp. 565 (S.D. Ind.1958), rev'd on another issue, 270 F.2d 616 (7th Cir. 1958), cert. denied, 361 U.S. 967, 80 S.Ct. 588, 4 L.Ed.2d 547 (1960). A plaintiff may not shift the burden of proving the amount of damage simply because a defendant "by his own wrong has precluded a more precise computation of damages." Assoc. Press v. Taft-Ingalls Corp., supra 340 F.2d at 769.
 
 
 34
 It must nevertheless be kept in mind that a treble damage plaintiff seeking recovery for market exclusion cannot provide detailed, concrete, and precise proof, Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). The fact finder may act on probability and inference. Any other rule would only induce the wrongdoer to inflict more grievous injury, thus immunizing himself from liability by causing the amount of damages to be uncertain, Bigelow v. R.K.O. Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). The law has not set down any mechanical test or formula as regards the required proof, Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), lest the rigid statement of the rule provide the very means to escape its sanction. Rather the courts have been liberal in designing rules of proof with respect to the amount of damages when the fact of damage, as here, is clearly established, Howard Industries, Inc. v. Rae Motor Corp., 293 F.2d 116 (7th Cir. 1961). Even though we may not agree with each step in the master's reasoning process, we must affirm, Edgewood American Legion Post No. 448 v. United States of America, 246 F.2d 1 (7th Cir. 1957), unless the findings are beyond the pale of sane judgment. Cf. Adventures in Good Eating, Inc. v. Best Places to Eat, Inc., 131 F.2d 809 (7th Cir. 1942). A finding is not clearly erroneous unless "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States of America v. United States Gypsum Co., 333 U.S. 364, 369, 68 S.Ct. 525, 529, 92 L.Ed. 746 (1948).
 
 
 35
 A perusal of the relevant portions of the record firmly convinces us that the master's findings are not clearly erroneous. That there are conflicts in the evidence and wide room for argument shows only that permissible conclusions were drawn. "[A] choice between two permissible views of the weight of [the] evidence is not `clearly erroneous'." United States of America v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150 (1949). The evidence offered by Radiant, while not conclusive, was the best attainable under the circumstances and clearly sufficient. Switzer, under the guise of questions of law, argues about the weight of the evidence.
 
 
 36
 2. The Cause of Radiant's Loss. Switzer contends that the master erred in determining lost sales because the loss was due, not to Switzer's acts, but Radiant's own "massive product problems." As regards the first product category, silk screen colors, the record shows that Radiant limited its market, did not offer silk screen until the third year of the damage period, had no intent to enter the silk screen market, produced a defective product which had to be withdrawn, finally produced acceptable silk screen but it was inferior to Switzer's, and later achieved product equality with Switzer but only by infringing the latter's patent.
 
 
 37
 With respect to the second product category, coated paper, the record shows that Radiant was without competition for the first three years of the damage period, lost part of the market due to a third party competitor which had a better product and distribution system complemented by lower prices, recaptured some of the market only by infringing on patents, and strained its production facilities to the breaking point, resulting in customer complaints and order cancellations for late delivery which further deteriorated its distribution network.
 
 
 38
 If the master allowed Radiant damages for losses which were not caused by Switzer, reversal is required. Causation between an anti-trust violation and damage sustained, must be shown.[15]
 
 
 39
 This, however, is only Switzer's side of the story. The master also heard Radiant's tale of woe. He concluded, in effect, that Radiant demonstrated power to grow when unmolested by Switzer's periodic anti-trust activity; Switzer's unlawful acts deprived Radiant of market experience which further damaged them by instilling a reasonable fear of pursuing aggressive market policies, and that Radiant was required to allocate a large measure of both its economic and human resources to the fight for survival rather than the struggle to improve.
 
 
 40
 Switzer's argument on this point has three basic flaws. It attempts to view the evidence from the point of view most favorable to it. Next, it has tried to work a radical separation between the two product categories involved. Finally, it urges a restrictive view of causation which traces Radiant's product problems only to the very immediate, albeit plausible, origins. The master, however, traced Radiant's debility back to its roots. Switzer may not thus "lawlessly clip [Radiant's] wings and escape liability * * * on the plea that [Radiant] could not fly." L. P. Larson, Jr., Co. v. William Wrigley, Jr., Co., 20 F.2d 830, 831, (7th Cir. 1927), rev'd on other grounds, 277 U.S. 97, 48 S.Ct. 449, 72 L.Ed. 800 (1928). Otherwise "the more flagrant * * * the invasion of another's rights, the more certain and complete would be the invader's immunity." Id. at 832. The master was correct in determining that Radiant's lost sales were "caused" by Switzer.
 
 
 41
 3. Computation for Certain Years. The master computed Radiant's lost sales on silk screen and coated paper from 1 January 1949. Switzer argues that a prior adjudication by the district court in this case bars recovery for lost paper sales prior to 5 June 1952, and for lost silk screen sales before 9 February 1953. The original decision before us in 1961 establishing liability found that Radiant had been injured in certain enumerated respects "and possibly in others."[16] Among the enumerations were findings that Radiant was injured in the sale of its coated paper after 5 June 1952 and injured in the sale of its silk screen after 9 February 1953.[17] The question presented is whether these findings constitute definitive holdings that Radiant sustained no lost sales of those items before the respective dates.
 
 
 42
 Before entry of these findings, Radiant requested the district court to find that its normal growth was forestalled by Switzer commencing on 1 January 1949. The request was rejected. On appeal, Radiant complained of the court's finding 29 on the ground that it did not specifically indicate that Switzer had forestalled its normal growth. We rejected the plea, pointing out that the decree did not purport it limit the scope of inquiry at the damage hearing and concluded that "[s]ince [Radiant] is not restricted in the scope of its proof before the master, it has no cause to complain that finding 29 might have been more specifically cast." Switzer Bros., Inc. v. Locklin, 297 F.2d 39, 49 (7th Cir. 1961), cert. denied, 369 U.S. 851, 82 S.Ct. 934, 935, 8 L.Ed.2d 9 (1962).
 
 
 43
 The master correctly reasoned that if finding 29 did not purport to limit the scope of inquiry as to the amount of damages, and that if he was to report on the amount of damages incurred, and if Radiant's complaint that finding 29 was not specific enough and was meritless because it was not restricted in the scope of its proof, then no final adjudication precluded the finding of lost sales from 1 January 1949. We agree with the district court — Switzer's interpretation of the findings seems strained.
 
 
 44
 4. The Use of Gross Sales. In determining Radiant's lost sales, the master used gross sales for the first six years of the damage period, switching to net sales for the last two years. Net sales would have excluded six types of items — credits, returns, allowances, products other than daylight fluorescent products, government sales, and foreign sales. The reasons advanced to show reversible error are that the parties agreed to put sales on a net basis, authority, both legal[18] and accounting, condemns the use of gross sales figures, and the use of gross sales had a compounding effect which increased the judgment by $275,328.
 
 
 45
 Switzer's citation to the record does not support the assertion that the parties agreed or stipulated to put sales on a net basis. Nor is its legal authority in point. Switzer's cited cases condemn an award of damages for loss of gross as opposed to net profits. To the extent that any reference is made to gross versus net sales, the only directive is that gross earnings must be related to net profits. See Garcia Mountain States Telephone & Telegraph Co., 315 F.2d 166 (10th Cir. 1963). Radiant's net profits were related to its gross sales. Moreover, some cases explicitly recognize the appropriateness of considering gross sales in determining a loss of net profits, see A. C. Becken Co. v. Gemex Corp., 199 F.Supp. 544 (N.D.Ill. 1961), aff'd, 314 F.2d 839 (7th Cir.), cert. denied, 375 U.S. 816, 84 S.Ct. 49, 11 L.Ed.2d 51 (1963) [lost profits]; L. P. Larson, Jr., Co. v. William Wrigley, Jr., Co., 20 F.2d 830 (7th Cir. 1927), rev'd on other grounds, 277 U.S. 97, 48 S.Ct. 449, 72 L.Ed. 800 (1928) [accounting]. The master did no more than that. His determination was that Switzer's net sales point was, per se, without merit. In other words, he considered the argument as going to the weight of the evidence. The master later scaled down the rate of return figure in a deliberate attempt to give Switzer's net sales point some effect. In this respect, as indeed throughout his report, the master took an extremely conservative approach, giving Switzer the benefit of any doubt. No just cause for complaint has been shown. The master's findings were within the range of permissible judgment. Edgewood American Legion Post No. 448 v. United States of America, 246 F.2d 1 (7th Cir. 1957); Adventures in Good Eating, Inc. v. Best Places to Eat, Inc., 131 F.2d 809 (7th Cir. 1942).
 
 
 46
 5. The Expert Testimony. Switzer next presents us with elaborate calculations and citation to the record to show that Radiant's experts were not qualified to project lost sales, that their factors were arbitrary, that certain grievously incorrect assumptions were made which even the master implicitly rejected unawares, that the figures are absurd because they indicate that Radiant's damage was inversely related to the time of the antitrust violations, that Radiant's contemporary appraisal of the situation radically conflicts with the master's findings, that the master took his pick of the evidence without rhyme or reason, that he even went so far as to fill gaps in the evidence by relying on his own expertise to pick figures out of the air because he assumed that he was obligated to find damages and, finally, the award indicates that for certain years Radiant would have had more sales than Switzer but for the latter's wrongful acts.
 
 
 47
 In any proceeding as long and as involved as this one, it is possible to pick away at the details and find numerous flaws and inconsistencies. Switzer has zealously explored every one. But in appellate review, our function is broader. We look to the entire record.
 
 
 48
 The damage award was for loss incurred for the years 1949 through 1956. The master found that but for the Switzers' unlawful activity, Radiant would have had gross sales of $68,000 in 1949. Lost sales were estimated to be $40,900. Radiant's actual 1950 gross sales, using 1949 equipment, were $85,200. Total "but for" 1949 gross sales were only 29% of Switzer's actual 1949 sales. And in 1951, while still using 1949 equipment, Radiant's actual gross was 52% of Switzer's net sales.
 
 
 49
 For 1950 the master found total Radiant gross "but for" sales of $351,000, lost sales being $258,400. Radiant's actual 1952 gross, using 1949 equipment, was $404,400. Moreover, Radiant's 1950 "but for" sales were 72% of Switzer's actual 1950 sales, even though two years later Radiant's actual gross sales were a full 88% of Switzer's actual net sales for the same year.
 
 
 50
 Radiant was determined to have lost sales of $173,600 in 1951, total "but for" sales being $525,000. The record shows that Radiant's actual production was 95% of the master's estimate. Total "but for" sales were approximately 90% of Switzer's net for 1951. Radiant's actual 1951 sales were up over 350% from 1950. Comparison of the 1950 and 1951 "but for" sales shows an upturn of only 50%.
 
 
 51
 For 1952 the master concluded that Radiant lost sales of $295,600. Total sales (estimated lost sales plus actual sales) were $700,000. Radiant's actual gross sales for 1952 were up 32% from the previous year. The master's determination represented a 33% increase on an estimated basis. Yet Radiant made a rapid surge in 1952, second quarter actual gross sales being 138.1% of Switzer's actual net. This was up 71% from the first quarter. Radiant's sales plummeted at this point, due in part to Switzer's initiation of the patent suit. The $700,000 figure is 152% of Switzer's 1952 Actual net sales. In view of the rapidity with which Radiant was overtaking Switzer, $700,000 is a reasonable extrapolation from the available data.
 
 
 52
 Radiant's 1953 lost sales were estimated to be $330,900, total "but for" sales being $660,000. The "but for" figure is 142% of Switzer's actual net for the same period, a 10% decline from the 1952 ratio.
 
 
 53
 For 1954, by which time Switzer abandoned its wrongful activity, the master gave Radiant total "but for" sales of $678,000. Lost sales were $339,300. The effects of Switzer's unlawful activity were not dissipated immediately upon its cessation, but were residual. The master's 1954 estimate shows a 3% growth from 1953. Radiant's actual growth was 3%.
 
 
 54
 For the second year after Switzer halted its anti-trust actions, 1955, the master gave Radiant lost sales of $343,500. Total "but for" sales were $757,200. Radiant's actual average quarterly net sales for 1955 were still below Radiant's net sales for the second quarter of 1952. The effects of Switzer's prior unlawful acts were still making themselves known. The master's 1955 figure is conservative.
 
 
 55
 The 1956 figures are lost sales of $184,000 and total "but for" sales of $730,300. The master concluded that Radiant's sales would have dropped in 1956, as his figures show. Yet Radiant's actual sales, both gross and net, rose.
 
 
 56
 The use of this comparative data was permissible. Bigelow v. R.K.O. Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946). A scrutiny of the total picture as revealed by the record shows that not only was the master's determination within the range of proper judgment, it was quite conservative.
 
 E. Rate of Profit
 
 57
 We now turn to the second element of the lost net profits figure, the rate of net profit determination. The master concluded that during the damage period, Radiant would have had a net profit of 16% on its lost sales. Switzer suggests that the figure, on its face, is excessive. Though at first blush 16% appears to be a high rate of return, it need only be noted that the industry, during the damage period, was a burgeoning one with a concomitant high risk of failure thus justifying what might otherwise be an abnormal net profit.
 
 
 58
 Switzer also assails the figure on an arithmetical ground. It is argued that the master arrived at the 16% figure by rounding off 16.6% which, in turn, was the mean between 19.05% (Radiant's highest estimate) and 14.15% (Radiant's actual net profit during the damage period as supposed by the master). The master, it is urged, miscalculated the last figure, Radiant's actual net profit during the damage period being only 11.93%. Thus the mean between Radiant's correct actual rate of net profit and highest estimate of net profit rate (11.93% and 19.05%) is 15.49% which should be rounded off to 15%. This one per cent difference is claimed to have added $59,000 to the judgment.
 
 
 59
 The fallacy in the argument is the assumption that the master calculated the net profit ratio solely on an arithmetical basis. He did no such thing. Although he did calculate the mean between the highest estimate of Radiant's net profit ratio and what was thought to have been Radiant's actual net profit ratio during the damage years, the record shows that the mean was not meant to be the final figure. Obviously 16.6% when rounded off does not equal 16%. Moreover, the master made certain very imprecise, yet nevertheless proper, downward adjustments. One such adjustment was made to take Switzer's net sales point into consideration.
 
 
 60
 The resulting net profit figure is, then, a composite one, combining arithmetical calculations and value judgments attributable to imprecise factors. We cannot determine how much weight the master gave to the various components in arriving at his conclusion. Since the result is not clearly erroneous, we cannot make an adjustment to the final figure simply because of error in one of the components when we cannot know how much weight, if any, was given to the erroneous element. It is improper to isolate individual factors entering into a decision and treat them as controlling considerations. Cf. United States of America v. I. C. C., 396 U.S. 491, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970). We find no error.
 
 
 61
 The judgment appealed from should be affirmed.
 
 
 62
 Affirmed.
 
 
 
 Notes:
 
 
 *
 District Judge from the United States District Court for the Northern District of Indiana, sitting by designation
 
 
 [1]
 Switzer Bros., Inc. v. Locklin, 207 F.2d 483 (7th Cir. 1953), cert. denied, 347 U.S. 912, 74 S.Ct. 477, 98 L.Ed. 1069 (1954)
 
 
 [2]
 Switzer Bros., Inc. v. Byrne, 139 F.Supp. 788 (N.D.Ohio 1956), aff'd. 242 F.2d 909 (6th Cir. 1957)
 
 
 [3]
 Switzer Bros., Inc. v. Locklin, 297 F.2d 39 (7th Cir. 1961), cert. denied, 369 U.S. 851, 82 S.Ct. 934, 935, 8 L.Ed.2d 9 (1962)
 
 
 [4]
 The findings, in pertinent part, read:
 
 
 [29]
 Radiant * * * has been directly damaged by * * * Switzer * * * in the respects noted in Findings 30 to 34 below,and possibly in others.
 
 
 [30]
 Commencing in 1950 and continuing until late in 1953, Radiant was put to expense in counteracting the Switzer propaganda and in reassuring dealers and customers that the Switzer program could not prevent the use of Radiant's products
 
 
 [31]
 Commencing on June 5, 1952, and continuing until February 11, 1958, Radiant was put to the expense of defending its customer, Chicago Cardboard Company, by virtue of the complaint filed in this action
 
 
 [32]
 Commencing on February 9, 1953, and continuing until April 8, 1957, Radiant was put to the expense of defending its customer, James P. Byrne, in the Northern District of Ohio, Eastern Division
 
 
 [33]
 Commencing shortly after June 5, 1952, Radiant's market in Velva-Glo paper became depressed due, at least in part, to the commencement of the instant action, and Radiant has lost profits which it otherwise would have made
 
 
 [34]
 Commencing shortly after February 9, 1953, Radiant's market in Velva-Glo silk screen colors became depressed due, at least in part, to the commencement of the Cleveland suit, and Radiant has lost profits which it would otherwise have made. (Emphasis added.)
 
 
 [5]
 Locklin v. Switzer Bros., Inc., 335 F.2d 331 (7th Cir.), cert. denied, 379 U.S. 962, 85 S.Ct. 652, 13 L.Ed.2d 557 (1964), rehearing denied, 380 U.S. 926, 85 S.Ct. 883, 13 L.Ed.2d 814 (1965)
 
 
 [6]
 The breakdown by the "findings" set out in Note 4, supra, was:
 Finding 30 $ 7,777.41 trebled
 Finding 31 30,000.00 trebled
 Finding 32 4,359.50 trebled
 Finding 33) 314,656.00 trebled
 Finding 34)
 Attorney Fees 75,000.00
 
 
 [7]
 It strikes us that Radiant is here asking for a favored position — an insured against inflation — devoid of attendant risk. As the master aptly noted: "While we all agree [that today's dollar is not the same thing as yesterday's] none of us can say that tomorrow's dollar may not equal yesterday's — whatever the odds may be at the moment."
 
 
 [8]
 This is quite unlike the patent statute, 35 U.S.C. § 284, which provides for damages "together with interest * * *."
 
 
 [9]
 Miami Parts & Spring, Inc. v. Champion Spark Plug Co., 402 F.2d 83 (5th Cir. 1968); Twentieth Century-Fox Film Corp. v. Winchester Drive-In Theatre, Inc., 351 F.2d 925 (9th Cir. 1965), cert. denied, 382 U.S. 1011, 86 S.Ct. 620, 15 L.Ed.2d 526 (1966); Dura Elec. Lamp Co., Inc. v. Westinghouse Elec. Corp., 249 F.2d 5 (3d Cir. 1957); Calif. Concrete Pipe Co. v. American Pipe & Constr. Co., 288 F.Supp. 823 (C.D.Cal.1968); Solar Elec. Corp. v. General Elec. Co., 156 F. Supp. 51 (W.D.Pa.1957); Combined Bronx Amusements, Inc. v. Warner Bros. Pictures, Inc., 132 F.Supp. 921 (S.D. N.Y.1955); Rector v. Warner Bros. Pictures, Inc., 102 F.Supp. 263 (S.D.Cal. 1952)
 
 
 [10]
 Dura Elec. Lamp Co., Inc. v. Westinghouse Elec. Corp.,supra, Note 9; Solar Elec. Corp. v. General Elec. Co., supra, Note 9.
 
 
 [11]
 Winchester Drive-In Theatre, Inc. v. Warner Bros. Pictures Dist. Corp., 358 F.2d 432 (9th Cir. 1966)
 
 
 [12]
 De Hart v. Richfield Oil Corp., 395 F.2d 345 (9th Cir. 1968); Twentieth Century-Fox Film Corp. v. Winchester Drive-In Theatre, Inc.,supra, Note 9.
 
 
 [13]
 The awards for combating propaganda and defending the complaint were trebled under 15 U.S.C. § 15
 
 
 [14]
 See Note 6,supra.
 
 
 [15]
 Dantzler v. Dictograph Products, Inc., 309 F.2d 326 (4th Cir. 1962), cert. denied, 372 U.S. 970, 83 S.Ct. 1097, 10 L.Ed.2d 133 (1963); Gorham & Johnson, Inc. v. Chrysler Corp., 308 F.2d 462 (5th Cir. 1962), cert. denied, 372 U.S. 912, 83 S.Ct. 725, 9 L.Ed.2d 719 (1963); Siegfried v. Kansas City Star Co., 298 F.2d 1 (8th Cir.), cert. denied, 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962); Sunkist Growers Inc. v. Winckler & Smith Citrus Products Co., 284 F.2d 1 (9th Cir. 1960), rehearing denied, 289 F.2d 933 (1961), rev'd on other grounds, 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962); Flintkote Co. v. Lysfjord, 246 F.2d 368 (9th Cir.), cert. denied, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); Dipson Theaters, Inc. v. Buffalo Theaters, Inc., 190 F.2d 951 (2d Cir. 1951), cert. denied, 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 691 (1952); American Can Co. v. Ladoga Canning Co., 44 F.2d 763 (7th Cir. 1930), cert. denied, 282 U.S. 899, 51 S.Ct. 183, 75 L.Ed. 792 (1931); A. C. Becken Co. v. Gemex Corp., 199 F. Supp. 544 (N.D.Ill.1961), aff'd, 314 F.2d 839 (7th Cir.), cert. denied, 375 U.S. 816, 84 S.Ct. 49, 11 L.Ed.2d 51 (1963)
 
 
 [16]
 Finding No. 29. See Note 4, supra
 
 
 [17]
 Findings No. 33 and 34, respectively. See Note 4, supra
 
 
 [18]
 Garcia v. Mountain States Telephone & Telegraph Co., 315 F.2d 166 (10th Cir. 1963); Wolfe v. Nat'l Lead Co., 225 F.2d 427 (9th Cir.), cert. denied, 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802 (1955); L. P. Larson, Jr., Co. v. William Wrigley, Jr., Co., 20 F.2d 830 (7th Cir. 1927), rev'd on other grounds, 277 U.S. 97, 48 S.Ct. 449, 72 L.Ed. 800 (1928); 2361 State Corp. v. Sealy, Inc., 263 F. Supp. 845 (N.D.Ill.1967); Vendo Co. v. Stoner, 105 Ill.App.2d 261, 245 N.E.2d 263 (1969); Snelling & Snelling of Mass., Inc. v. Wall, 345 Mass. 634, 189 N.E.2d 231 (1963); Henry's Drive-In, Inc. v. Anderson, 37 Ill.App.2d 113, 185 N.E.2d 103 (1962)