**PAPER CONVERTING MACHINE CO., Inc., Plaintiff,**

v.

**FMC CORPORATION, Defendant.**

**No. 59–C–152.**

United States District Court
E. D. Wisconsin.

June 5, 1967.

See also D.C., 215 F.Supp. 249.

Dawson, Tilton, Fallon & Lungmus, Chicago, Ill., Wheeler, Wheeler & Wheeler, Milwaukee, Wis., for plaintiff.

Lyon & Lyon, Los Angeles, Cal., Andrus & Starke, Milwaukee, Wis., for defendant.

## OPINION

TEHAN, Chief Judge.

On July 24, 1959, the complaint in this action was filed by Paper Converting Machine Co., Inc., alleging that the defendant, Hudson-Sharp Machine Co. was infringing U. S. Letters Patent No. 2,870,840, which patent, covering a web cutting apparatus, was issued to plaintiff on January 27, 1959 on an application filed May 16, 1957. The defendant answered on August 17, 1959 denying infringement, alleging invalidity of the patent and setting forth a defense of file wrapper estoppel. The original defendant thereafter merged with Food Machinery and Chemical Corporation, now FMC Corporation, and FMC Corporation is the present defendant.

This case came on for trial by the court, post-trial briefs were filed, oral argument was heard and the court is prepared to render its decision.

The issues originally raised herein have been narrowed considerably since the complaint and answer were filed. Of the nine claims of the patent in suit only six, Claims 1, 2, 3, 4, 8 and 9 are now asserted to be infringed by the accused devices. The defendant has not pressed its defense of invalidity and on oral argument and in briefs did not argue it. And furthermore, the defendant's argument with respect to infringement has been restricted to one element only of the claims in suit, it being conceded, or at least uncontested, that all other elements are present in the accused devices.

The patent in suit describes an apparatus for perforating toilet paper or other thin paper webs. Prior to 1950, the perforating operation was accomplished on punch-type perforators which consisted generally of two rotating rolls one having teeth or knives and the other having slots. The paper web to be perforated was wrapped tightly around the roll equipped with slots and cut by the teeth engaging the slots as it passed between the rotating rolls. The paper used in this operation was coarser than that with which we are now familiar and the perforation less desirable in that a wide bond existed between slits, which was frequently difficult to tear evenly. In addition with punch-type perforators, paper mills experienced difficulty in maintaining uniform perforation.

In approximately 1950 a new toilet tissue, Delsey, introduced by Kimberly-Clark, appeared on the market manufactured with a high-grade, softer paper perforated in such a manner as to permit a very neat tear-off. The manufacture of this product was achieved with a pinch-type perforator which also consisted of two rotating rolls, one carrying a hardened blade and the other having grooves, which perforated with a pressure cutting action. The Delsey product was superior and a product which competing paper mills wished to duplicate but the pinch-type perforator used in its production had substantial drawbacks. Although uniform perforation on high grade tissue was accomplished it was not possible to utilize pinch-type perforators on machines which were as wide as or operated at as high a speed as competing paper mills required and such perforators had very precise maintenance requirements.

The introduction of the Delsey product gave rise to a demand by Kimberly-Clark's competing paper mills for a perforator which would perform equivalent perforation on machines wider than those at Kimberly-Clark which could be operated at commercially acceptable speeds. Some paper mills unsuccessfully attempted to solve the problem themselves and plaintiff and Hudson-Sharp, both manufacturers of machinery for the paper in-

dustry, were pressed by their customers for a solution. The patent in suit represents the plaintiff's answer to its customers' demands.

Hudson-Sharp began experiments to manufacture a commercially acceptable perforator which would produce tissue competitive with the Delsey product in about 1953, but its efforts were sporadic and unsuccessful until late in 1956. At that time, Orrin Besserdich, a design engineer at Hudson-Sharp, was instructed to proceed with the experiments "as the number one project". As to the urgency of the project, it should be noted that on September 5, 1956, a Hudson-Sharp salesman had informed management that a customer, Crown-Zellerbach, was soon to view plaintiff's first perforator in operation at Charmin Paper Co. and, if it operated satisfactorily would replace all Hudson-Sharp winders, and would be lost to Hudson-Sharp as a customer.[1] Thereafter Hudson-Sharp stepped up its experimentation, but failed to produce a satisfactory perforator until it incorporated therein essential features of the plaintiff's perforator, which was already in customers' plants.

Since, as we have stated previously, only one element of the claims here involved is presently contended by the defendant not to exist in the accused devices, the Charmin and Ft. Howard machines, we see no need to discuss in detail the structure described in the patent. It is sufficient to say that the patent describes a perforating structure which has one rotating roll, the bedroll, around which the webb is partially wrapped, equipped with thin, flexible blades, and that the bedroll blades during operation contact skewed stationary blades, transversely perforating the web. The stationary blades are described in the claims as rigidly mounted or supported in a blade-supporting block or knife holder, which block or knife holder does not move or rotate during perforation. The sole question here presented is whether the stationary or anvil blades in the accused machines are rigidly mounted or supported as required by the claims in issue.

The only difference between the machine disclosed in the patent and the accused structures relied upon by the defendant as avoiding infringement has been succinctly described by the defendant as follows:

"In the patented structure, the anvil blades are solidly clamped against the beam portion of the machine frame, whereas in the accused structure a transverse shaft *pivotally* supports the blades through an anvil casting carried by the shaft, *a spring being interposed between the anvil and the frame beam.*" (Emphasis ours)

It is the position of the defendant that since springs are interposed between the casting holding the stationary blades and the beam those blades are not rigidly supported or mounted. It is the position of the plaintiff that those springs due to pre-load, do not perform as springs during "normal operation"[2] but perform as

---

1. In his report, the salesman stated:

"I have been advised by Mr. Wymore that before this month is over Crown is going to contract winders for their entire operation as they are changing over 100% to the score or slit type of perferation. Mr. Wymore is going to be in Green Bay sometime this month to see P. C. Machine Co. start up their score type perferation winder at the Charmin Paper Co. If it proves out satisfactory, they are going to replace all of our winders.

I suggest we come up with some kind of model to show him we have the score type perferation also and catch him while in Green Bay. I have talked him into coming over to our plant as he wants to meet the new Mgr.

If we lose out on this winder order we can forget Crown as a customer. If we can prove to him that we have this perferation, we can have an immediate order."

2. The operation characterized by plaintiff as "normal" has been described by the defendant as "ideal". When we use the term "normal" operation, we refer to an operation in which the web is moving through the perforating unit and being perforated. In so doing we do not imply that there is not ever present the possibility of wads and wrap-ups at the perforator which possibility, if occurring

solid blocks, and that the defendant's interposition of springs, with their ability to compress when abnormal conditions arise,[3] constitutes at best an improvement over the patented structure and does not avoid infringement. These positions give rise to the following questions:

1. Do the springs in the accused structures permit movement of the anvil blades during normal operation?

2. Even if no movement of the anvil blades in the accused structures occurs during normal operation, are those blades resiliently supported or mounted by reason of the fact that movement of the anvils is concededly permitted by the springs during abnormal operations?

We have considered carefully the evidence relative to the question of whether the anvils in the accused structures move during normal operation, and are satisfied that such movement cannot and does not occur. This belief is inspired to a great extent by the testimony of Professor Ralph J. Harker, an expert witness called by the plaintiff, and fortified by a study of the testimony of Dr. Lydik S. Jacobsen, an expert witness called on behalf of the defendant.

It is clear that any movement or pivoting of the anvils and anvil blades in defendant's accused machines during normal operation must be caused by interference between the thin, flexible bedroll blades and the anvil blades as the bedroll rotates. It is also clear that the force necessary to produce such movement must be sufficient to overcome the force exerted by the springs which hold the anvils in position against an adjusting

screw contacting a stop button. The parties are in agreement that the springs exert eighty pounds of force.

Professor Harker, who admittedly conducted no tests on the accused devices, proved to our satisfaction by the application of scientific principles that during contact at normal interferences the bedroll blades exerted only about 22 pounds of force, an amount insufficient to overcome the force exerted by the springs and permit movement. Professor Harker's calculations, characterized as theorizing by the defendant, stand unrefuted.[4]

Our study of the testimony of Dr. Jacobsen, convinces us that he neither proved that movement of the anvil ocurred during normal operation of the accused structures nor himself believed that he had so demonstrated. Dr Jacobsen embarked on a series of tests on defendant's machines satisfied before he started that the anvils were resiliently rather than rigidly mounted or supported due to the presence of the springs. In our opinion, he admitted, in effect, at the trial that his tests proved nothing with respect to motion of the anvils during normal operation,[5] but maintained that their ability to "roll with the punches" due to the presence of the springs nonetheless rendered them resiliently mounted. He did not believe that the size of the "punches" necessary to cause movement was significant or relevant to the question of whether the anvils were rigidly supported. Dr. Jacobsen's testimony established only what the plaintiff has conceded—that the defendant's anvils

necessitates stoppage of the unit whether it be of plaintiff's or defendant's construction.

3. The plaintiff does not question the fact that the springs can be further compressed during what it terms "abnormal" conditions, such as the presence of wads or wrap-ups, so as to permit pivoting of the anvils and blades supported thereby.

4. The defendant has argued that Professor Harker, in making his calculations, ignored friction in establishing the direction of force and varied the direction of the force in determining the amounts nec-

essary and available, but has failed to demonstrate in any way that these matters operated to prejudice the defendant or that calculations made in a manner considered proper by the defendant, correcting Professor Harker's alleged errors, would result in a conclusion that the bedroll blades could exert sufficient force to overcome the pre-load.

5. This admission extended to defendant's theory that movement may have occurred about or within the clearance between the anvil and shaft although the force causing it was not sufficient to compress the springs.

will pivot in the presence of wads, etc.—but shed no light on the question of whether movement occurs during normal operation.

We must here note that the record does not reveal that springs were interposed in the defendant's machine to permit movement of the anvils and anvil blades during the normal perforating operation or to perform any function during such operation. Such an advantage or purpose was not shown to have been advanced by the defendant as a desirable feature when the perforators were introduced. Rather the springs are described in the defendant's early literature as holding the anvil in position and no statement is made that anvil movement during perforating occurs or is desirable.

The indirect evidence of motion in the anvils during perforating cited by the defendant, is far short of demonstrating that movement does in fact occur when the machines are operating properly.

We must therefore consider whether the presence of springs in the accused structures which, due to their pre-load, do not perform resiliently during the perforating operation but rather act to fix the anvils in position, means that the anvil blades are not rigidly supported or mounted within the meaning of the claims in issue, since the springs permit movement of the anvil during overload conditions. In so doing, we must again state that wads, wrap-ups and various paper irregularities causing overload conditions are ever present possibilities and apparently fairly frequent occurrences in paper mills, and perforators are designed with these possibilities in mind and equipped, either within the perforating unit or with auxiliary equipment, to guard against them.

■ While a spring is unquestionably resilient, it can function as a rigid bar and the springs do so function in the accused structures until their pre-load is overcome, a condition which does not occur while the structures are performing the function for which they are designed, that is, perforating paper. When the springs cease to operate as a rigid bar, that is, when their latent resilient capabilities are called into play by overload conditions, the structures cease to perform their intended function since the machines must be stopped to correct the trouble in the web being fed through them. Under these circumstances we must hold that anvil blades in the accused structures are rigidly supported or mounted within the meaning of the claims in issue. We reject the defendant's contention that a spring mounting or support cannot, by its very nature, be considered rigid even in situations where, as here, the spring functions as a rigid member holding the anvil blade in cutting position and preventing movement while perforation is taking place. We also reject the defendant's contention that, in asserting that the defendant's anvil support is rigid during normal operation and admitting that it it non-rigid during overload conditions, the plaintiff is improperly attempting to interpret its patent as covering a mode of operation rather than a structure. The defendant's anvil support is rigid for all practical purposes during operation of the machine and the interposition therein of a member having resilient capacities not utilized during perforation may be an improvement over the patented device but does not avoid infringement.

The claims in suit describe the anvil blade or blades as "stationary" and the defendant has denied infringement with respect to this limitation on precisely the same grounds on which it asserted non-infringement because of lack of a rigidly supported blade. For the reasons stated above regarding that assertion this contention is without merit.

■ We also believe the file wrapper estoppel defense asserted by the defendant to be without merit. This defense presupposes that the defendant's anvil blades are not "rigidly supported," a requirement inserted in the claims after rejection based on prior art. We have held that those blades are in fact rigidly supported. This being the case, the plaintiff is not here attempting to re-

capture what was abandoned before the examiner.

Counsel for the plaintiff will prepare findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure and submit them to opposing counsel for approval as to form.