### PAPER CONVERTING MACHINE CO., INC., Plaintiff,

v.

### FMC CORPORATION, Defendant.

No. 59–C–152.

United States District Court, E. D. Wisconsin.

May 18, 1977.

Jerome F. Fallon and Tilton, Fallon, Lungmus, Chestnut & Hill, Chicago, Ill., and Joseph P. House, Jr., and Wheeler, Morsell, House & Fuller, Milwaukee, Wis., for plaintiff.

Charles F. Meroni, Sr., Charles F. Meroni, Jr., and Hill, Gross, Simpson, Van Santen, Steadman, Chiara & Simpson, Chicago, Ill., Arthur H. Seidel, Jr., and Quarles & Brady, Milwaukee, Wis., for defendant, FMC Corp., for Special Master's Report and Findings of Fact.

Ronald L. Engel, George B. Javaras, Robert G. Krupka and Kirkland & Ellis, Chicago, Ill., Arthur H. Seidel, Jr., and Quarles & Brady, Milwaukee, Wis., for defendant, FMC Corp., for objections to the Special Master's Report and Findings of Fact; Charles F. Meroni, Sr., Charles F. Meroni, Jr., and Hill, Gross, Simpson, Van Santen, Steadman, Chiara & Simpson, Chicago, Ill., of counsel.

## DECISION AND ORDER

MYRON L. GORDON, District Judge.

### I. INTRODUCTION

This action was commenced on July 24, 1959, by Paper Converting Machine Company, Inc. (PCMC), against Hudson-Sharp Machine Company, alleging that that defendant was infringing United States Patent No. 2,870,840. This patent related to perforators, or paper converting machines, used to perforate paper into tearable toilet paper rolls. Hudson-Sharp Machine Company was subsequently merged with Food Machinery and Chemical Corporation (FMC), the instant defendant.

On June 5, 1967, after a court trial, Judge Robert E. Tehan decided the issue of infringement in favor of the plaintiff and rejected the defense of file wrapper estoppel. 274 F.Supp. 372. The United States court of appeals for the seventh circuit affirmed. 409 F.2d 344 (7th Cir. 1969), cert. denied, 396 U.S. 877, 90 S.Ct. 154, 24 L.Ed.2d 136 (1969).

On December 2, 1969, Judge Tehan appointed Dale E. Ihlenfeldt as master to conduct an accounting and to make a determination of the amount of damages sustained by the plaintiff as a result of the defendant's infringement. Mr. Ihlenfeldt was succeeded in this position on February 2, 1972, by Franklyn M. Gimbel. Several hearings were conducted before the masters regarding discovery and other contested matters. They engaged the services of independent accountants, attended numerous depositions, conducted a final hearing from February 4, 1974, through February 21, 1974, and reviewed the briefs and proposed findings of fact and conclusions of law submitted by counsel for the parties.

On June 15, 1976, Mr. Gimbel filed a report in which he found that the plaintiff was entitled to recover a total of three million, six hundred eighty-four thousand, five hundred and fifty dollars ($3,684,550). Detailed findings of fact and conclusions of law corresponding to the contents of his report were filed on July 20, 1976.

The defendant moved to reject the master's report, findings, and conclusions; the plaintiff, while generally supporting the master's recommendations, raised objections of its own to certain of them. Voluminous briefs were filed by the parties regarding the master's recommendations, and a hearing was held before this court at which counsel presented their respective positions. Mr. Gimbel has submitted a request for fees for his activities as master during the period from April, 1974, to June, 1976. The parties have agreed that his request is reasonable.

Upon review of the record, the plaintiff's objections to the master's report, findings, and conclusions will be denied, and the defendant's motion to reject the master's report, findings, and conclusions will be denied in part and granted in part. The master's findings and conclusions, modified in certain respects, will be adopted, and the master's request for fees will be granted.

### II. THE MASTER'S FINDINGS

A summary of the master's report is necessary for the nature of the parties' objections to be understood. The master reviewed the background of the invention, a shear-cut perforating system which presented the first system for efficient high-volume commercial production of slit, pinched, or clean-cut perforated toilet paper. Previous production methods either produced inferior punch-perforated paper with unsatisfactory tearing qualities or produced clean-cut paper, but in low volumes and at unreasonably high cost. He set forth the relationship of the plaintiff's patented perforator to its present nearly exclusive position in the United States as manufacturer and seller of automatic rewinders, a line of machinery much broader than the perforators themselves.

Finding that but for the inclusion of the infringing perforators in its rewinders, the defendant's sales of rewinders and auxiliary equipment would not have been made, the master determined that the plaintiff's damages should be calculated upon the defendant's sales of perforators, rewinders, and

auxiliary equipment, not upon sales of perforators alone. The independent accountants determined that the amount of the defendant's sales of such equipment was $5,213,900, a figure adopted by the master.

In determining a measure for the plaintiff's damages resulting from these infringing sales, the master restated the FMC sales to PCMC's higher prices, finding that the infringing sales amounted to $6,256,800 in lost sales to PCMC. Applying the accountants' incremental cost analysis, the master determined that PCMC's incremental profits, before taxes, on the lost sales would have been $2,439,700. These base damages were increased by 50% by the master, based on his finding that the infringement was willful.

In addition, the master found that the defendant should pay $25,000 as attorneys' fees as a result of its motion to suspend the accounting proceedings on the basis of alleged fraud in the procurement of the plaintiff's patent. This motion, filed after the accounting proceedings had begun, was denied by Judge Tehan, who authorized the master to consider the motion as a factor in awarding attorneys' fees. The master found the motion to have been without merit and conceived with no real intent or basis to succeed, but rather for the purpose of "derail[ing]" the accounting aspects of this case."

## III. THE STANDARD OF REVIEW

Rule 53(e)(2), Federal Rules of Civil Procedure, provides in part:

"In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous."

The United States court of appeals for the seventh circuit has stated:

"The parties are entitled to a real review to determine whether or not the factual findings are clearly erroneous. Although the master's findings of fact are binding on the district court unless clearly erroneous, Rule 53(e)(2), Fed.R. Civ.P., that rule is not 'an invitation to abdicate the judicial function upon receiving a master's report.'" *Locklin v.*

*Day-Glo Color Corp.,* 429 F.2d 873, 876 (7th Cir. 1970). (Citations omitted).

In language that is applicable to this proceeding, the court in *Locklin* addressed the standards to be applied in reviewing a master's accounting of damages:

"Obviously a case such as this does not admit of precise proof. Radiant was attempting to prove sales it did not make. To be sure a finding may not rest on guess or speculation. On the contrary, a plaintiff must prove the amount of damages by a preponderance of the evidence. Such proof need not be direct but may, instead, be circumstantial, even to the point of estimates based upon assumptions, provided that the assumptions rest upon an adequate base . . . .

". . . Even though we may not agree with each step in the master's reasoning process, we must affirm, unless the findings are beyond the pale of sane judgment. A finding is not clearly erroneous unless 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' . . .

". . . That there are conflicts in the evidence and wide room for argument shows only that permissible conclusions were drawn. '[A] choice between two permissible views of the weight of [the] evidence is not "clearly erroneous."'" 429 F.2d at pp. 879–80. (Citations omitted).

The clearly erroneous rule does not apply, of course, to the master's conclusions of law.

## IV. THE PLAINTIFF'S OBJECTIONS

The plaintiff objects to findings of fact 111–113, conclusion of law 21, and those portions of the master's report corresponding thereto as embodying errors of law by not providing adequate compensation pursuant to 35 U.S.C. § 284. I find these objections to be without merit.

The plaintiff urges that because of the duration of these proceedings, the intervening inflation and the loss of inter-

est on the damages which have been determined require that the damages be trebled if they are to be "adequate to compensate for the infringement." As an additional ground for trebling the damages, the plaintiff urges that its reasonable attorneys' fees amount to $258,300. The plaintiff's arguments for increasing damages as a result of inflation and loss of interest are contrary to the clear law of this circuit. *Columbia Broadcasting System v. Zenith Radio Corp.*, 537 F.2d 896 (7th Cir. 1976); *Wahl v. Carrier Manufacturing Co., Inc.*, 511 F.2d 209 (7th Cir. 1975); *Locklin v. Day-Glo Color Corp.*, 429 F.2d 783 (7th Cir. 1970). Nor is the fact that the plaintiff incurred attorneys' fees in and of itself a ground for increasing damages beyond those determined.

In view of the master's increase of the damages by 50% over the base damages as a result of his finding of willful and deliberate infringement, I am unable to agree with the plaintiff's suggestion that the damages are inadequate. For the above reasons, the plaintiff's objections to the master's report, findings, and conclusions will be denied.

## V. THE DEFENDANT'S OBJECTIONS

The defendant's motion to reject the master's report, findings, and conclusions urges that the master clearly erred in finding willful and deliberate infringement, in his construction and application of the entire market value rule for purposes of fixing the damage base, in basing damages on the plaintiff's allegedly lost profits and in his determination of those lost profits, and in failing to fix a reasonable royalty under 35 U.S.C. § 284. The first of the defendant's claims will be denied in its entirety; the others will be granted in part and denied in part.

### A. Willful and Deliberate Infringement

Pages 24 through 28 of the master's report and findings 95 through 109 of his corresponding findings of fact set forth the master's views on the issue of whether the defendant's infringement was willful and deliberate. Substantial portions of the parties' briefs are devoted to this issue, and not surprisingly, the parties have conflicting views as to the weight of the evidence on willfulness and the appropriate inferences to be drawn therefrom.

The master's factual findings are supported by evidence in the record, evidence to which the master specifically referred in setting forth his analysis of the issue. In finding 97, he noted that his determination of whether the defendant's infringement was willful and deliberate was based on circumstantial evidence.

I am unable to find that the master's findings, inferences, or analysis are "beyond the pale of sane judgment." After reviewing the record, I am not left "with the definite and firm conviction that a mistake has been committed." Accordingly, under the standards of review set forth in *Locklin v. Day-Glo Color Corp.*, 429 F.2d 873 (7th Cir. 1970), the defendant's motion to reject the master's report and findings on the issue of willful and deliberate infringement will be denied.

### B. The Scope of Infringing Sales

In pages 3 through 7 and 23 through 24 of his report and in findings 16 through 35 and 110 of his corresponding findings, the master set forth his views on the proper determination of the defendant's infringing sales. The master found that after 1958 the industry in the United States would not accept anything other than clean-cut perforator systems on rewinder machinery. He also found that paper companies did not want split responsibility, that is, buying different components of a rewinder system from different suppliers. These findings were based on substantial evidence, including testimony of employees of the parties and of their customers and documents demonstrating that the ability to supply high-volume clean-cut perforators as an element of rewinder systems was a prerequisite to sales of such systems.

The master's finding of a "but for" relationship between the ability to supply perforators which performed like the plain-

tiff's patented perforator and the ability to make sales on the market for rewinder systems of which perforators were components was reflected in industry-wide beliefs and practices. I believe the defendant's contention that this general finding was clearly erroneous is incorrect.

The defendant also urges that even if the "but for" finding of the master is found to be factually correct, that the master's expansion of the scope of infringing sales beyond the patented perforator mechanism in reliance thereon was incorrect as a matter of law. The master relied on the long-standing "entire market value" rule which allows recovery based on the value of an entire mechanism containing several features, even though only one feature is patented, where substantially the entire marketable value of the total mechanism is attributable to the patented feature. *Crosby Steam Gage and Valve Co. v. Consolidated Safety Valve Co.*, 141 U.S. 441, 12 S.Ct. 49, 35 L.Ed. 809 (1891); *Goulds Mfg. Co. v. Cowing*, 105 U.S. 253, 26 L.Ed. 987 (1881); *Zysset v. Popeil Brothers, Inc.*, 318 F.2d 701, 707 (7th Cir. 1963); *National Rejectors v. A.B.T. Mfg. Corp.*, 188 F.2d 706, 709 (7th Cir. 1951); *American Safety Table Co. v. Schreiber*, 415 F.2d 373, 377 (2d Cir. 1969). The rule is perhaps most clearly stated in *Westinghouse v. Wagner Mfg. Co.*, 225 U.S. 604, 614–15, 32 S.Ct. 691, 694, 56 L.Ed. 1222 (1912):

"But there are many cases in which the plaintiff's patent is only a part of the machine and creates only a part of the profits. His invention may have been used in combination with valuable improvements made, or other patents appropriated by the infringer, and each may have jointly, but unequally, contributed to the profits. In such case, if plaintiff's patent only created a part of the profits, he is only entitled to recover that part of the net gains. He must therefore, 'give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative; *or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the machine, as a marketable article, is properly and legally attributable to the patented feature.*'" (Emphasis added).

I accept the master's finding that the plaintiff has met its burden under the latter test as to sales of rewinders in the United States.

The defendant's legal contention is that the "patent misuse" doctrine which was developed subsequently to the entire market value rule, and which prohibits a patentee from extending its patent monopoly to unpatented elements, as for example, through a tie-in license, has done away with the entire market value rule. The defendant relies on cases such as *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), and *Aro Mfg. Co. v. Convertible Top Co.*, 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1963) (*Aro II*). I am unpersuaded that these cases have overturned the entire market value rule; I believe that the defendant has misconstrued the nature and purpose of that rule.

The entire market value rule does not allow a patentee to over-extend its patent monopoly, but merely permits a recognition of the actual economic value of the patent under the unusual circumstances in which market conditions themselves would prevent an unlicensed and noninfringing seller from making sales in the market for the entire machine, even though only one or more elements are patented. The master's finding that inclusion of the plaintiff's patented perforator in rewinders was a prerequisite to their marketability simply reflects the market conditions that made the value of the entire rewinder properly attributable to the perforator alone.

The market itself, not any overextensions by the plaintiff, created a situation under which the plaintiff could properly have granted perforator licenses to others with

royalty rates that would have absorbed all or virtually all of the profits to be expected as a result of sales of the entire rewinders.

The licenses could not have restricted the licensees from selling rewinders without infringing perforators, under the patent misuse doctrine, but the point of the entire market value rule is that such sales were simply not feasible, even in the absence of license restrictions, unless the sellers were prepared to supply the patented perforators as well. In order to offer a full line of equipment, to increase total sales or reduce fluctuations in sales, or to gain whatever increment of profit that might remain, an uncoerced licensee might well accept royalty terms for perforators which absorbed virtually all of the expected profits from the sale of entire lines of rewinders, even though it might be free in the absence of a license to attempt unsuccessfully to market its perforatorless equipment. Since actual profits on such sales might be less than those expected, a licensee could conceivably freely agree to royalty terms that turned out in fact to leave it with a loss on such sales rather than the expected gain.

■ In summary, the result of the defendant's position would be that an infringer would, in effect, be entitled to a compulsory license with royalties limited to its actual profits on the patented element, despite the fact that royalties determined through arms-length bargaining would most likely have included much, if not all, of the expected profits from combination sales. However, profits from such combination sales are properly considered in computing royalties or damages. *Zegers v. Zegers, Inc.*, 458 F.2d 726, 730 (7th Cir. 1972). The infringer had no right to a compulsory license since the patentee was free to decline to grant any licenses. Rather than a source of patent misuse as the defendant contends, the patentee's rights under the master's view of the law properly reflect the economic value of the patent at issue and greatly encourage the desirable result of continued invention within the industry through competitors' attempts to design around the patent. For all of the above reasons, I reject the defendant's legal challenge to the master's use of the entire market value rule.

■ The defendant raises additional challenges to the master's determination of the scope of infringing sales. It contends that inclusion of the Walmsley sale and of conversion sales within those sales which would have been made by the plaintiff but for the defendant's infringement was clearly erroneous. An objection is made to recovery of damages for the defendant's sale of replacement parts, on the basis that such damages are precluded as a matter of law. Finally, the defendant urges that the master included as infringing sales certain sales which took place prior to the issuance of the plaintiff's patent, for which the plaintiff is not entitled to damages.

At pages 23 and 24 of his report, the master referred to a substantial sale by the defendant to an English purchaser for use in the Soviet Union, noting that

"there is little basis in the record before the Master to attribute those sales to Defendant's infringing perforator. The Master will not speculate that a 'but for' justification exists to warrant Plaintiff's entitlement to Defendant's gain on the Walmsley transaction, either directly or by way of motivating increased damages."

Finding 110 is similar. However, when the master made his calculation of damages, he did in fact include the entire Walmsley sale, in the amount of $860,500 as one within the scope of the "but for" rule, and calculated the profits the plaintiff would have earned had it made the sale. In view of the master's specific finding quoted just above, which I find to be supported by the evidence of much different market circumstances in the Soviet Union, I believe that the master erred in his calculation.

■ As the defendant contends, the plaintiff is not entitled to its hypothetical profits on the entire transaction, but only to a reasonable royalty on that portion of the sale composed of infringing perforators. However, there is no similar inconsistency

in the master's report and findings with respect to conversion sales; I am not persuaded that his finding that such sales would have been made by the plaintiff in the absence of the defendant's infringement is clearly erroneous.

 The defendant's suggestion that *Aro Mfg. Co. v. Convertible Top Co.*, 377 U.S. 513, 84 S.Ct. 1526 (1963), precludes an award of damages for the defendant's sale of replacement parts is unpersuasive. Indeed, precisely the contrary would seem to be true. *Ibid.*, p. 513, 84 S.Ct. 1526.

 The parties agree that sales made prior to January 27, 1959, the date of issuance of the patent, must be considered outside the scope of damages. The master included within the "but for" damage base $144,100 of sales which were ordered and shipped prior to that date, but which were ultimately paid for thereafter, on the ground that the form conditional sales contracts left title in the seller until full payment had been made. I believe that the master erred with respect to a matter of law in this regard, since reservation of title as a security interest is irrelevant to a determination of when the sale took place. Under the Uniform Conditional Sales Act then in effect in Wisconsin, §§ 122.01 et seq., Wis. Stats., the sale was made when the conditional sales contract was executed or the goods shipped, not when payment was completed. See § 122.27, Wis. Stats. Therefore, the plaintiff is entitled to no damages, whether by recovery of its hypothetical profits or reasonable royalties, for these sales.

Accordingly, the defendant's objections to the master's determination of the scope of infringing sales will be accepted in part and rejected in part. The master's finding that the defendant made $5,213,900 in sales which would have been made by the plaintiff but for the infringement will be reduced by $860,500 for the Walmsley transaction and by $144,100 for the pre-issuance sales, for a finding by the court that the plaintiff lost sales in the amount of $4,109,-300. In addition, the plaintiff will be entitled to reasonable royalties on the perfora-

tors involved in the Walmsley transaction, which amounted to $59,700 in sales.

## C. The Plaintiff's Lost Profits

 In addition to challenging the master's determination of the amount of infringing sales, or the damage base, the defendant challenges his calculation of the plaintiff's damages resulting from those sales. Specifically, the defendant urges that the master's assessment of damages measured by the plaintiff's lost profits on the sales which it would have made in the absence of the defendant's infringement, rather than by one of the other methods included in the report of the accountants, was clearly erroneous. Additional objections are made, if the lost profit approach is found to be acceptable, to the restatement of the defendant's sales at a 20% higher level to reflect higher prices for the plaintiff's products, and to the details of the accountants' incremental cost analysis as applied to the plaintiff's incremental sales. In view of the standard of review to be applied to the factual findings of the master, as set forth above in part III of this decision and order, I find these objections to be without merit.

 However, the defendant also contends that the master erred as a matter of law with respect to the issue referred to in pages 18 through 21 of his report, findings 88 through 91 of his findings of fact, and conclusion 11 of his conclusions of law. This issue was whether the plaintiff's incremental income, or profit, figures as determined by the accountants should be adjusted upwards to include amounts for year-end officers' compensation and profit sharing. The master determined that such adjustments should be made, on the ground that the plaintiff would be obligated to make officers' compensation and profit sharing payments out of any judgment it obtained in this action.

In my opinion, the master's *approach* was correct, but his determination that the plaintiff would be obligated to make such payments based upon any recovery in this

action was legally incorrect. I believe that the express terms of the profit sharing plan and of the officers' compensation plans do not obligate the plaintiff to make payments out of any damage award arising from this litigation, since such a damage award would not represent income from sales but would be an extraordinary item not arising from usual business operations. Accordingly, the defendant's objection to this adjustment in the accountants' profit figures should be accepted by the court.

Therefore, the $4,109,300 of the defendant's sales which would have been made by the plaintiff will be restated to $4,931,160 at the plaintiff's prices. The accountants' figure for the plaintiff's incremental income before taxes of 25.2% of the plaintiff's incremental revenues will be applied to the restated sales figure. (The 25.2% figure is derived from page 17 of the master's report and from master's finding 88). The result is a figure of $1,242,652 for the plaintiff's lost profits on these sales. In addition, royalties will be assessed against a portion of the Walmsley sale.

D. Reasonable Royalties

The defendant urges that the master was required by 35 U.S.C. § 284 to fix a reasonable royalty for its use of the plaintiff's invention. The language of the statute itself requires only that damages be "in no event less than a reasonable royalty for the use made of the invention by the infringer." There is language to be found in the case law to the effect that a royalty level must be set in all cases, as for example in *Wahl v. Carrier Manufacturing Co.*, 511 F.2d 209, 214 (7th Cir. 1975). Compare *Zegers v. Zegers, Inc.*, 458 F.2d 726, 729 (7th Cir. 1972).

The master believed that establishing a royalty level was unnecessary because the parties were in agreement that his damage finding exceeded a reasonable royalty. That view may have been acceptable within the context of the master's other findings, but some of those findings have been modified by this court. Specifically, the court has found that the lost profits on lost sales

approach to damages cannot be applied to the Walmsley transaction because that sale would not have been made by the plaintiff in the absence of infringement. Accordingly, there is a need to establish a reasonable royalty to be applied to the infringing perforators sold as part of that transaction.

The defendant urges that an upward limit on a reasonable royalty is imposed by its level of profits on the infringing sales, and it finds some support for this contention in *Zegers, supra*, 458 F.2d at 728, n. 8. In my discussion above of the entire market value rule, I noted that negotiated royalties were based on prospective profit estimates, which may or may not turn out to be accurate. If a rule were to be applied limiting post-infringement court determination of royalties to the infringer's actual profits, the effect would be to insure the infringer against losses in those situations where actual profits are less than the royalty level that would have been freely negotiated prior to the infringement.

■ However, I find no basic difficulty in applying the *Zegers* royalty limitation to the facts of the Walmsley transaction. The defendant's profits on the transaction were $177,000 on sales of $860,500, for a profit margin of 20.6%. I find that a reasonable royalty rate on foreign sales of the patented perforator is 20% of the sales price. Accordingly, reasonable royalties on the $59,700 sales of infringing perforators in the Walmsley transaction are $11,940.

E. Other Objections

The defendant raised numerous sub-issues in its briefs, but I believe my prior comments on the major issues explicitly or implicitly resolve the sub-issues as well. However, to the extent that any of these additional objections have not been directly addressed above, I hold that the objections are without merit.

## VI. MASTER'S FEES

Mr. Gimbel has submitted a request for fees in the amount of $10,000 for his services as master during the period from April,

1974, to June, 1976. The parties have indicated that they believe fees in this amount to be reasonable, and I agree. Mr. Gimbel has well performed a valuable service to the parties and to this court. The parties will be directed to pay fees in the requested amount, sharing the cost equally as previously agreed.

## VII. CONCLUSION

The findings and conclusions of the master are accordingly adopted, to the extent that they are not inconsistent with this decision and order.

The plaintiff is entitled to $1,242,652 in lost profits on lost sales and to $11,940 in reasonable royalties on the defendant's sale of perforators in the Walmsley transaction. These amounts are to be increased by 50%, for a recovery of $1,881,888. In addition, the plaintiff is entitled to $25,000 as attorneys' fees on the defendant's motion to suspend the accounting proceedings.

Therefore, IT IS ORDERED AND ADJUDGED that the plaintiff recover of the defendant the sum of $1,881,888 as damages, plus $25,000 as attorneys' fees, and costs as allowed by law.

IT IS ALSO ORDERED that within 10 days of the date of this order the plaintiff and the defendant pay to Franklyn M. Gimbel the sum of $10,000 as fees, the burden of such payment to be shared equally by the parties.